[Civ. No. 30269. First Dist., Div. Four. Nov. 18, 1971.]

JOHN FREDERICK EISEMAN, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Ralph J. Steinberg and Berns & Steinberg for Petitioner.

Evelle J. Younger, Attorney General, Edward P. O'Brien, John T. Murphy and Gloria F. DeHart, Deputy Attorneys General, for Respondent and for Real Party in Interest.

## OPINION

**BRAY, J.**[*]—This is a petition for writ of prohibition to restrain the Santa Clara County Superior Court from proceeding to trial with respect to counts 4 and 5 of an information.

### QUESTIONS PRESENTED

1. The superior court was bound by the determination at the preliminary examination that petitioner did not consent to the search.

2. The contraband was not seized in a valid search incident to the arrest.

### RECORD

A complaint was filed in the Municipal Court of the Palo Alto-Mountain View Judicial District, charging petitioner and David Marshall Hydie and Gary Phillip Smith with five violations: count 1, violation of Health and Safety Code section 11531 (sale of marijuana); count 2, violation of section 11530 (possession of marijuana); count 3, violation of section 11530.5 (possession of marijuana for sale); count 4, violation of section 11500 (possession of cocaine); and count 5, violation of section 11910 (possession of amphetamines).

At the preliminary hearing in that court petitioner was held to answer on all five counts, but his motion to suppress was granted as to marijuana found in drawers in petitioner's room but denied as to all other exhibits.

After the filing of an information in the superior court charging defendant with the above-mentioned five counts, defendant moved under Penal Code section 1538.5 to suppress other evidence. The motion was denied. Thereupon petitioner filed this petition for writ of prohibition.

### FACTS[1]

Officer Brian Vierra was an undercover officer for the City of Palo Alto. On May 13, he received a call from one Edward Hodge proposing a purchase of marijuana. Accepting the proposal, Officer Vierra and his partner Sergeant Gary Smith (also undercover) rendezvoused with Hodge and two

---

[*]Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]There was a conflict as to some of the facts herein set forth, but we are required to set forth the evidence supporting the action of the trial court.

others—David Hydie and Gary Phillip Smith who were to provide their part of the purchase price.

The five proceeded in two different cars to the ZAP fraternity house on the Stanford campus. Officer Vierra and Hydie took $200 to room 126, where petitioner Eiseman accepted it and turned over two pounds of marijuana, breaking open the kilo for his buyers' inspection, and indicating he had access to more.

Officer Vierra and Mr. Hydie returned to the car, and in order to effectuate arrest in the safest manner, the Officers Vierra and Smith arranged a meeting at a vacant industrial park. There the car trunk was opened, the signal for the three surveillance officers to converge and effect arrest.

The officers', Vierra and Smith, next concern was to return to room 126, arrest the seller and recover the $200. Though they had met Mr. Eiseman, they were unsure of his true or full name, whether the room had been his, and whether he had some immediate plans for the $200 purchase price, $110 of which was marked money paid by Officer Vierra.

Arriving at the ZAP house, Officer Vierra spotted Eiseman walking in the courtyard outside the fraternity house. Officer Vierra proceeded toward Eiseman followed by Officer Smith. The third officer who had accompanied them, Officer Mee, remained concealed some 30 feet behind them. Officers Smith and Vierra saw several persons in the patio area, and 35 to 50 persons were visible in the adjacent dining room. Officer Mee from his vantage point, hiding behind a gate, vaguely recalled seeing one woman sunning herself. Petitioner claims only one person was there.

Officer Vierra called to petitioner, asking to speak to him. Fearful of revealing their identities as undercover officers and aware of a hostile element in that area, the officers followed petitioner back to room 126, his response to Officer Vierra having been an invitation back to the room.

In a matter of seconds they had traversed the short distance to the room, possibly making some small talk about the quality of the drug and desire to purchase more. Petitioner contends he stated the drug belonged to a roommate, while Officers Vierra and Smith denied such a statement was made.

Petitioner unlocked the door and entered the room followed by Vierra and Smith. It was at this time that the officers stated they were police and that he was under arrest. Officer Smith showed his badge and, since the officers were undercover, made it clear this was a "bust" not a "rip-off" and that they were police. Petitioner was several times advised of his

rights. There is some conflict as to whether Officer Vierra exhibited his gun at this time.

Officer Vierra testified at the hearing that he asked Eiseman if he could search the room. Officer Mee testified that Vierra asked if there was any contraband, not that he asked to search the room. Eiseman testified that Vierra stated "Do you want to show us where the rest of the stuff is or are we going to have to tear the place apart?" In any event, Eiseman opened a desk drawer, producing therefrom two lids of marijuana, and then two more lids from a dresser drawer. (It was this marijuana which was ordered suppressed at the preliminary hearing.)

On top of the dresser were some containers. Eiseman claimed that these vials were in a shaving kit there. Vierra denied that they were in a kit. Officer Mee did not recall the containers. He merely remembered a shaving kit there. Officer Vierra testified that by merely looking at a white plastic bottle which read "Vicon C," he could tell that it contained a small paper bindle. Until he opened the paper there was no way of knowing it contained contraband.

A second bottle had a label reading "Mol-Iron," which label almost surrounded the bottle. It obviously was not a normal capsule vial. It contained small white tablets. Vierra picked it up, and knew that it contained amphetamines because of the size, color and double score on the white tablets in it.[2] As will hereinafter appear, Officer Vierra's observation that certain vials may have contained contraband did not occur until after he moved to the dresser.

1. *The finding at the preliminary hearing that petitioner did not consent to the search is binding on the superior court.*

■ The committing magistrate found that petitioner's consent to the search, if given, was not voluntary, pointing out that Eiseman was confronted by three police officers, had been under the care of a psychiatrist and was very emotional at the time of the arrest and that Eiseman denied giving consent. At the hearing in the superior court of the motion to suppress brought by petitioner, that court refused to be bound by the committing magistrate's ruling and denied the motion to suppress. The court erred.

Penal Code section 1538.5, subdivision (j), reads, in pertinent part, as follows: "If the property or evidence relates to a felony offense initiated by complaint and the defendant's motion for the return or suppression of

---

[2]The officer also picked up from the dresser an unmarked bottle (apparently withdrawn as Exhibit 163).

the property or evidence at the preliminary hearing is granted, and if the defendant is held to answer at the preliminary hearing, the ruling at the preliminary hearing shall be binding upon the people unless, upon notice to the defendant and the court in which the preliminary hearing was held and upon the filing of an information, *the people within 10 days* after the preliminary hearing *request in the superior court a special hearing,* in which case the validity of the search or seizure shall be relitigated de novo on the basis of the evidence presented at the special hearing, and the defendant shall be entitled, as a matter of right, to a continuance of the special hearing for a period of time up to 30 days." (Italics added.)

The People requested no special hearing within 10 days after the preliminary hearing. It was in fact the defendant's section 1538.5 motion that was heard in the superior court. There was no attempt by the prosecution to try to relitigate the question of consent by introducing into evidence the bags of marijuana found in the dresser drawers that had been suppressed by the municipal judge.

Section 1538.5, subdivision (j), is plain. The conclusion of the committing magistrate, in view of the failure of the People to follow the procedure set forth in the statute for relitigating de novo the validity of the seizure, "[is] binding on the people . . . ." *People* v. *Heard* (1968) 266 Cal.App.2d 747 [72 Cal.Rptr. 374], and *Thompson* v. *Superior Court* (1968) 262 Cal.App.2d 98 [68 Cal.Rptr. 530], cited by the Attorney General, are not in point. Neither case considers the effect of section 1538.5, subdivision (j).

## 2. *The search was not valid.*

■ ■ The committing magistrate (other than as to the marijuana) and the superior court refused to suppress the evidence seized in Eiseman's room. The discussion under this title deals solely with the material found on top of the dresser. Primarily petitioner contends that the real object of the officers' entering the room was to conduct a search rather than to effectuate an arrest. If this were true, the search would not be reasonable and the officers would have had no right to enter the room. (*People* v. *Haven* (1963) 59 Cal.2d 713, 719-720 [31 Cal.Rptr. 47, 381 P.2d 927].) The police officers testified that they wanted to arrest petitioner so as not to "blow their cover" and to avoid causing an incident by arresting a student in an open courtyard. Petitioner testified that he was having dinner with 30 other people when he saw Officer Vierra enter the courtyard. It is clear from this testimony that at least some of the rest of the 30 people had the same view. Thus, if the undercover agents had arrested Eiseman in the courtyard there would be nothing left of their undercover

identity and further there might have been an incident. The reasons stated by the officers appear to be valid reasons for not arresting Eiseman outside the room and negate the theory that they waited to make an arrest in the room solely so they could search the room. There is also the testimony that petitioner asked or agreed to have Officer Vierra come to his room.

As this was a search without a warrant, the burden is on the prosecution to show its validity (*Horack* v. *Superior Court* (1970) 3 Cal.3d 720, 725 [91 Cal.Rptr. 569, 478 P.2d 1]), and to show that the search was incident to the arrest. There were ample grounds for the arrest. The officers had just purchased a kilo of marijuana from petitioner. There was good reason to effectuate arrest in petitioner's room rather than in the hall or patio. This was an arrest by undercover agents on the very campus where they had occasion to work, in an area where others were present, and where there had been unrest in the past. Eiseman was an unknown quantity. They had no reason to know that he was a student or whether or not that was his room or his true name or whether or not he was popular among some element which would seek to prevent arrest. To protect their cover and avoid unnecessary involvement of third parties, they went to the room to effectuate arrest—a move completely justified by legitimate purposes. With persons in or near the patio, other cars in the parking lot, other rooms which could open into the hallway, room 126 was the safest place to effectuate arrest. There is no requirement of arrest at the instant when the crime is complete if the consequences create unnecessary danger.

The exhibits complained of (Exhibits 3 and 5) were contained in two vials on top of the dresser in a small room, 17.3 by 15.4 feet, filled with desk, beds, and dresser. Petitioner was arrested in the area in front of the desk but was not confined to that area. He was at the desk, sitting on the bed, moving to the dresser. *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], while setting forth rather stringent requirements for search incident to arrest, nevertheless holds proper a search limited to the area in which the arrestee might reach a weapon or destroy evidence. However, the officers did not claim that their actions were based on fear that Eiseman would reach for a weapon or would destroy evidence. They believed they had his permission to search.

The People contend that Exhibits 3 and 5, which were vials on top of the dresser at the other end of the room from which petitioner and Officer Vierra (who made the arrest) were located, at the time of the arrest were in such plain sight of Vierra that they raised a suspicion in his mind that they contained contraband and hence that the rule that contraband in plain sight may be seized by the arresting officer applies. (*People*

v. *Roberts* (1956) 47 Cal.2d 374 [303 P.2d 721].) However, an examination of the record shows that the exhibits were not in such plain sight as to justify the officer in picking them up and examining them. They were in the midst of a clutter of bottles and vials and a shaving kit, on top of the dresser some 12 feet from where the arrest was made. Officer Smith testified that standing in the middle of the room and seeing the clutter on the dresser top he saw nothing unusual in it. While Officer Vierra, at one time, said the exhibits were in plain sight he did not state where he then was. It is clear from his detailed examination that it was not until he walked over to the dresser and then looked at the bottles on it before he became suspicious of their contents, and even then he had to pick up the bottles and look at them to determine that they might contain contraband. Exhibit 5 was a bottle with a "Mol-Iron" label around it. The bottle had to be turned around to look into it. This bottle contained small white tablets with indentations which Vierra stated meant amphetamines of a type made only in Mexico. Exhibit 3 was a semi-opaque vitamin bottle which on examination appeared to contain a large "bindle."

Eiseman, in addition to taking the marijuana out of the desk drawer, led Vierra around the room and to the cluttered dresser. This was a part of Eiseman's consent to the search, which consent the committing magistrate determined was not voluntary. It is clear that Vierra's search of the dresser top was the result of that consent and not based on any view of the cluttered dresser top which he had before arriving at the dresser. That the officers thought they had permission to search the room is shown by Vierra's statement at the preliminary examination that the other officers "were walking throughout the room looking for any visible contraband. If you consider that searching, yes, they were searching the room."

The Attorney General contends that the area which may be searched would be extended in this case by the fact that petitioner had gone to the dresser when he was showing Officer Vierra the marijuana in the dresser drawer. Since it appears this court is bound by the municipal court's finding that there was no consent by the petitioner to the search, once the officers had placed him under arrest and searched the area within his immediate reach they had completed their business in his room. The police should not be allowed to extend the scope of *Chimel* v. *California, supra,* 395 U.S. 752, by having a person under arrest move around the room at their request. The fact that petitioner did move about somewhat in the room does not extend the area that may be searched as incident to an arrest. The evidence clearly shows that nothing that the officers saw on the dresser prior to approaching it with what they considered was Eiseman's permission to search excited their suspicion. In *People* v. *Marshall* (1968)

69 Cal.2d 51 [69 Cal.Rptr. 585, 442 P.2d 665], the officers, in going through defendant's house looking for him, saw a brown paper bag in plain view which they opened and found to contain marijuana. The court held "A plain view of simply suspicious looking or unusual objects does not justify their seizure without a warrant." (69 Cal.2d at p. 58.) The court said further: "In the present case the brown paper bag itself was not contraband. Only by prying into its hidden interior [citation] could the officer be sure that he was seizing contraband and nothing more. The fact that the container was only a brown paper bag instead of a packing box, purse, handbag, briefcase, hatbox, snuffbox, trunk, desk, or chest of drawers [citation] is immaterial. It is inherently impossible for the contents of a closed opaque container to be in plain view regardless of the size of the container or the material it is made of. A search of the container is necessary to disclose its contents. A search demands a search warrant." (69 Cal. 2d at pp. 58-59.)

*People* v. *Superior Court* (1969) 2 Cal.App.3d 131 [82 Cal.Rptr. 507], holds that if contraband is in plain view it may be picked up to be examined. In the instant case the exhibits were not contraband in themselves but were picked up to see if they contained contraband. Cases cited by the Attorney General, such as *People* v. *Nickles* (1970) 9 Cal.App.3d 986 [88 Cal. Rptr. 763], and *People* v. *Kampmann* (1968) 258 Cal.App.2d 529 [65 Cal.Rptr. 798], where the contraband was in plain view, and *People* v. *Brown* (1962) 205 Cal.App.2d 188 [22 Cal.Rptr. 835], where there was consent to the search, are not in point.

Let the peremptory writ of prohibition issue as prayed.

Devine, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied December 16, 1971, and the petition of the real party in interest for a hearing by the Supreme Court was denied January 13, 1972. McComb, J., and Peters, J., were of the opinion that the petition should be granted.