[Civ. No. 37059. First Dist., Div. One. Nov. 17, 1975.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA
COUNTY, Respondent;
RICHARD REILLY, Real Party in Interest.

42

**COUNSEL**

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Linda Ludlow, Deputy Attorneys General, for Petitioner.

Sheldon Portman, Public Defender, Philip H. Pennypacker and Joaquin Celaya, Deputy Public Defenders, for Respondent and for Real Party in Interest.

## OPINION

SIMS, J.—Real party in interest, after waiving a preliminary examination, has been charged with three counts of forging and counterfeiting a driver's license with the intent to use it to facilitate the commission of a felony (Pen. Code, § 470a), and three counts of possession of a counterfeit driver's license with similar intent (§ 470b). On his motion to suppress evidence the trial court ordered the suppression of certain items seized at the time of his arrest. The People have sought review of that order (§ 1538.5, subd. (o)), and we have issued an alternative writ of mandate.

The trial court suppressed certain evidence which the defendant, while under surveillance immediately prior to his arrest, removed from the area from within which he might have obtained it, and which was seized by the arresting officers from the locations where he had attempted to conceal it. The trial court apparently concluded that the proscription on search attendant to arrest enunciated in *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034] required such a result. The accused seeks to defend the court's ruling on that theory and also reiterates a contention advanced in the trial court that the entire search was invalid because the officers failed to comply with the provisions of section 844 of the Penal Code[1] in entering to arrest the accused and his juvenile confederate. For reasons set forth below we determine that neither contention has merit. A peremptory writ must issue as prayed for by the People.

The accused waived a preliminary hearing and all of the evidence was adduced from examination of the arresting officer at a special hearing on the accused's motion to suppress. The following facts appear: At 2:20 a.m. on January 28, 1975, while on patrol with his partner Sergeant Bush

---

[1]Penal Code section 844 provides: "To make an arrest, a private person, if the offense be a felony, and in all cases a peace-officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

in a marked police vehicle in the vicinity of South First Street in San Jose, Officer Larry Reuter of the San Jose Police Department observed a white over blue Oldsmobile parked in front of room 10 at the Three-A Motel on South First Street. The car had no license plates. Six days previously Reuter had been advised to be on the lookout for a beige 1965 Oldsmobile with license number NFW 088, whose owner was wanted for suspicion of heroin possession and sales, and was reportedly staying at motels in that area of South First Street. Reuter ran a vehicle identification number check of the vehicle which did not match up with that of the wanted car.

The car parked in front of room 10, the only room alight in the motel, bore an expired temporary emergency operating sticker. From his place on the public sidewalk used for reaching the units of the motel, Reuter noticed that the curtains to room 10 were open about three inches and he looked in to ascertain whether there was anybody present to explain the lack of current evidence of licensing of the car, and to determine whether there was anyone present who would answer the reported physical description of the drug suspect. He saw a young man, James Pierce, sitting in front of a desk. On the desk was a tripod mounted with a camera pointing down, and lights. Leaning up on the base pole was a card with blue printing which Reuter believed was a driver's license from another state and later recognized as a Colorado driver's license.

Reuter advised Sergeant Bush of what he had seen and Bush knocked on the door. Pierce asked "Who's there?" and Reuter stated "San Jose Police Department." When Pierce opened the door two or three inches, the officers asked him to whom the Oldsmobile belonged. At that point Reilly came out of the shower with a towel around his waist, and despite the extremely cold night came outside. He told the officers that the car belonged to him, and that the necessary papers were in the car.

Reilly went to the Oldsmobile and produced the papers. While Pierce, who had also come out, stood at the front of the vehicle, Reilly spoke with the officers for about five minutes and then asked to go inside to dress as it was cold outside. Given permission to go inside, Reilly shut the door on Reuter who had started to follow Reilly inside.

Reuter then went to the window and watched Reilly, who took a brown wallet off of the desk top and put it in the upper right hand drawer of the desk. Reuter also observed Reilly putting the photographic material and the Colorado driver's license into a brown box on the floor.

Reilly was then observed taking a black container, which was of a type used for, and later proved to contain traveler's checks, into the bathroom.

Pierce, who was outside in his bare feet at the time, requested permission to go inside and was allowed to do so. He tried to shut the door on the officers as Reilly had done, but was unable to do so. The officers entered the room and placed both Pierce and Reilly under arrest.

On the top of the desk only a few minor things remained. In the box on the floor the officers found a Colorado driver's license with Pierce's picture on it and various items of information filled in. Also in the box were photographs, approximately 12 or 13, of the defendant, Reilly. The brown wallet which Reuter had previously seen Reilly place in the desk drawer was removed and inspected. Inside the wallet were approximately 10 different pieces of identification containing different names, date of births, and social security cards. Though the numerous pieces of identification, including driver's licenses from three states, fit the defendant they all contained different names. In the bathroom of the motel the officers found the black packet of traveler's checks hidden under two or three towels. The name James A. Krug which was on two of the driver's licenses was on the checks.

I

Preliminarily it may be noted that at the time he made his original observations the officer, since he was on property open to public common use, was where he had a right to be. (See *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 631-633 [108 Cal.Rptr. 585, 511 P.2d 33]; and *People* v. *Berutko* (1969) 71 Cal.2d 84, 91 [77 Cal.Rptr. 217, 453 P.2d 721].) There was therefore no violation of the accused's or his confederate's constitutional rights in making the initial observation through the window. The explanation of the officer's presence at the scene or his motive for looking in the window are not of great significance. Anyone passing by could observe Pierce's strange nocturnal activity.

The court apparently properly concluded that the observation of an individual working with a camera and driver's license at 2 a.m. provided probable cause to arrest Pierce for a felony committed in the officer's presence. So much was conceded by Reilly's attorney at the hearing. The fact that the officers did not immediately act with respect to that offense, but elected to first secure an explanation of the ownership of the car, did

not lessen their right to proceed to arrest Pierce. The original approach to the premises was accompanied by an announcement of the identity of those seeking admittance, and an announcement of the purpose to ascertain the ownership of the car. No rights were violated.

Reilly withdrew in a manner which precluded entry by the officers to further investigate the apparent counterfeiting of a driver's license. His actions, as then observed from outside, implicated him in the wrongdoing attributed to Pierce, and there was then cause to enter to arrest Reilly. There was no need for the officers to announce their identity again, and any announcement of their purpose in accompanying Pierce through the door would have been superfluous because it was apparent that Reilly knew he was engaged in wrongdoing, and was hurrying to eliminate all evidence which would reveal it. ■ "Under the doctrine of 'substantial compliance' the requirements of section 844 will be deemed satisfied where police officers identify themselves, demand entry and, although they fail to explain why they seek admittance, it is reasonably apparent to the occupants why the police wish to enter. [Citations.]" (*People* v. *Hill* (1974) 12 Cal.3d 731, 758 [117 Cal.Rptr. 393, 528 P.2d 1]. See also *People* v. *Peterson* (1973) 9 Cal.3d 717, 722-724 [108 Cal.Rptr. 835, 511 P.2d 1187]; *People* v. *Tribble* (1971) 4 Cal.3d 826, 832-837 [94 Cal.Rptr. 613, 484 P.2d 589]; *People* v. *Superior Court* [*Manfredo*] (1971) 17 Cal.App.3d 195, 202-203 [94 Cal.Rptr. 643]; *People* v. *Peterson* (1970) 9 Cal.App.3d 627, 631-633 [88 Cal.Rptr. 597]; and *People* v. *Boone* (1969) 2 Cal.App.3d 66, 68-69 [82 Cal.Rptr. 398]. Cf. *People* v. *Bennetto* (1974) 10 Cal.3d 695, 700-702 [111 Cal.Rptr. 699, 517 P.2d 1163]; *People* v. *Dumas* (1973) 9 Cal.3d 871, 877-879 [109 Cal.Rptr. 304, 512 P.2d 1208]; *Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 318-324 [82 Cal.Rptr. 348, 461 P.2d 628]; *Greven* v. *Superior Court* (1969) 71 Cal.2d 287, 290-295 [78 Cal.Rptr. 504, 455 P.2d 432]; *People* v. *De Santiago* (1969) 71 Cal.2d 18, 28-30 [76 Cal.Rptr. 809, 453 P.2d 353]; and *People* v. *Gastelo* (1967) 67 Cal.2d 586, 588-589 [63 Cal.Rptr. 10, 432 P.2d 706].)

■ The trial court in upholding the seizure of that which was in plain sight at the time of the entry correctly ruled that it was not invalidated by the manner in which the officer had made his observation, or by the manner in which they entered.

## II

■ The trial court did suppress the wallet, which the accused had placed in the desk, and the driver's licenses and other identification cards

which it contained, and, as well the packet of traveler's checks. ██ It is well established that when the seizure comports with constitutional and statutory requirements, evidence of crime may be seized as well as contraband, instruments of crime and fruits of crime. (See *Warden* v. *Hayden* (1967) 387 U.S. 294, 300-302 [18 L.Ed.2d 782, 788-789, 87 S.Ct. 1642]; and *People* v. *Thayer* (1965) 63 Cal.2d 635, 637-638 [47 Cal.Rptr. 780, 408 P.2d 108].)

In *Chimel* v. *California, supra,* the court concluded that there is no constitutional justification, in the absence of a search warrant, for extending the search incident to the lawful arrest of an accused beyond his person and the area from within which he might obtain either a weapon or something that could be used as evidence against him. (395 U.S. at p. 768 [23 L.Ed.2d at pp. 696-697].) The basis of this rule was enunciated after a thorough review of prior precedents. (*Id.* at pp. 755-762 [23 L.Ed.2d at pp. 689-693]. See also *Guidi* v. *Superior Court* (1973) 10 Cal.3d 1, p. 7, fn. 4 [109 Cal.Rptr. 684, 513 P.2d 908], and accompanying text.) The court recognized, "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. *In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.* And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule." (*Id.* at pp. 762-763 [23 L.Ed.2d at p. 694], italics added.) The court pointed out, "There is no comparable justification, however, for *routinely* searching any room other than that in which an arrest occurs—or, for that matter, for searching through *all* the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less." (*Id.* at p. 763 [23 L.Ed.2d at p. 694], italics added, fn. omitted.) The court distinguished " 'an unrestrained and thoroughgoing examination' " of a suspect and his personal effects from the type of search approved in *Chimel* and the earlier case of *Peters* v. *New York* (1968) 392 U.S. at page 67 [20 L.Ed.2d at page 937, 88 S.Ct. 1889] (*id.* p. 764 [23 L.Ed.2d p. 694], and it approved the statement of Judge Learned Hand (*United States* v. *Kirschenblatt* (2d Cir. 1926) 16 F.2d 202, 203) that an arrest of a man in his house should not give the power " 'to rummage at will among his papers in search of whatever will convict him.' " (*Id.,*

p. 767 [23 L.Ed.2d p. 696].) It did, however, indicate a broader proscription when it said, "The only reasoned distinction is one between a search of the person arrested and the area within his reach on the one hand, and more extensive searches on the other." (*Id.* p. 766 [23 L.Ed.2d p. 696], fn. omitted.)

▇ Nevertheless, we have no hesitancy in ruling that where the suspect, in fear of imminent disclosure or arrest, is observed to secrete an article, which if left in plain sight would have been subject to seizure, there is no constitutionally unreasonable search or seizure in retrieving that article from the place where the suspect was observed to have placed it. In *Guidi* v. *Superior Court, supra,* 10 Cal.3d 1, the court ruled, ". . . that the police may effect plain view seizures of evidence found in the course of properly circumscribed cursory searches for suspects, free of former constitutional restrictions of such seizures to contraband or stolen property." (10 Cal.3d at p. 14.) ▇ We may conclude therefrom that if the wallet, an article customarily used to carry evidence of identification, and a packet, appearing similar to those usually used for traveler's checks, were in plain sight as the officers entered and made the arrests for counterfeiting and possessing false identification, both articles could have been seized as evidence of the offenses. *Eiseman* v. *Superior Court* (1971) 21 Cal.App.3d 342 [98 Cal.Rptr. 342], upon which the accused relies, involved an exploratory search in the course of which contraband, only visible after prying into a container, was seized. There the court held that a finding that there was no consent for the search rendered the seizure invalid because it could not be justified under *Chimel* or under the plain sight rule. (21 Cal.App.3d at pp. 348-351.)[2]

Since the right to search and seize which was reserved in *Chimel* was for the purpose of insuring that the suspect to be arrested could not seize and destroy evidence, it would be absurd to rule that because he was successful in removing an observed article from his immediate presence moments before his arrest, the officers could not retrieve it from where it was placed. It is obvious that the police may retrieve that which the suspect throws out of the premises. (See, e.g., *People* v. *Rodrigues* (1938) 25 Cal.App.2d 393, 394 [77 P.2d 503]; and note *People* v. *Mijares* (1971) 6

[2]Insofar as the *Eiseman* court relied on *People* v. *Marshall* (1968) 69 Cal.2d 51 [69 Cal.Rptr. 585, 442 P.2d 665] for the proposition that a container may not be inspected, it is a questionable precedent. Where there is probable cause to believe the article contains contraband because of its nature and because of prior information in the possession of the seizing officer, a contrary result may be proper. (See *People* v. *Cook* (1975) 13 Cal.3d 663, p. 668, fn. 4 [119 Cal.Rptr. 500, 532 P.2d 148]; and *Guidi* v. *Superior Court, supra,* 10 Cal.3d 1, p. 17, fn. 18.)

Cal.3d 415, 422 [99 Cal.Rptr. 139, 491 P.2d 1115].) In *United States* v. *Bradley* (1st Cir. 1972) 455 F.2d 1181 [affd. on other issues *Bradley* v. *United States* (1973) 410 U.S. 605 (35 L.Ed.2d 528, 93 S.Ct. 1151)], the defendant as he was being placed under arrest in one room of an apartment, threw a flight bag, which the officers had probable cause to believe contained contraband, into the next room. There the bag remained in plain view. The court stated: "The bag was within Johnson's control at the instant of arrest, and remained in plain view thereafter, thus giving rise to a *duty* to seize it. [Citation.] *Chimel* prohibited general exploratory searches incident to arrest but did not erect impenetrable barriers at every doorway." (455 F.2d at p. 1187.) Here it is true that the wallet and packet did not remain in plain sight, but the place of attempted concealment had been revealed to the prying eyes of the officer, and permitted him to retrieve the articles with no more exploratory search than if the drawer in the one room and the towels in the bathroom were transparent. *Chimel's* concern over the possibility of destruction or concealment of evidence would appear to control its apprehension that an arrest be used as an excuse for a general exploratory rummaging search when the circumstances are limited to those found in the instant case.

It must also be borne in mind that it is a criminal offense to destroy or conceal evidence. (Pen. Code, § 135.[3] See *People* v. *Mijares, supra,* 6 Cal.3d 415, 422; and *People* v. *Lee* (1970) 3 Cal.App.3d 514, 526 [83 Cal.Rptr. 715]. Cf. *People* v. *Edgar* (1963) 60 Cal.2d 171, 174-175 [32 Cal.Rptr. 41, 383 P.2d 449].) Here, unlike *People* v. *Edgar, supra,* there was an attempt to conceal the evidence witnessed by the officers. It would be incongruous to prohibit the officers from seizing evidence of the misdemeanor which was committed in their presence, while at the same time upholding their right to arrest the perpetrator.

Finally it may be noted that the articles in question because of their nature may be considered as within the scope of a seizure permitted by *Chimel.* In *People* v. *Belvin* (1969) 275 Cal.App.2d 955 [80 Cal.Rptr. 382] the search, of the purse of an alleged parole violator attendant to her arrest for violation of her parole, occurred prior to the decision in *Chimel.* Nevertheless the court recognized the rule of that case and

---

[3]Penal Code section 135 provides: "Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is about to be produced in evidence upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor."

distinguished it as follows: ". . . it is equally evident that normal extensions of the person remain subject to search and that articles customarily carried by an arrested person fall within the area of his immediate control. In the category of such articles we include a woman's purse, *a man's wallet,* a jacket, a hat, an overcoat, and a brief case in use at the time of arrest, even though these articles may not be on the immediate person of the arrestee at the moment of arrest. Such articles not only serve as possible sources of concealed weapons and of evidentiary items but also normally accompany the arrested person on his removal to some other place. Their search thus serves the dual function of security and of legitimate investigation. We conclude that defendant's purse, apparently in use by her at the time of her arrest, legally amounted to an extension of her person and could be searched on her arrest. Whether the search of the purse took place before or after defendant's physical removal to another room we consider wholly fortuitous." (275 Cal.App.2d at pp. 958-959, italics added. See also *People* v. *Edwards* (1971) 22 Cal.App.3d 598, 602 [99 Cal.Rptr. 516] [seizure and search of jacket in close proximity to arrestee].)

█ We also note that seizures involving a search of areas within the proximity of the arrestee are permitted although nothing subject to seizure is in plain sight. In *People* v. *King* (1971) 5 Cal.3d 458 [96 Cal.Rptr. 464, 487 P.2d 1032], the court recognized that *Chimel* was not applicable to a search and seizure made prior to the date of that decision but it noted that *Chimel* permitted search with a flashlight under the bed, from which the officer had directed the arrestee to remove herself, and the seizure of a brown paper bag and its contents. (5 Cal.3d at pp. 462 and 463.) In *People* v. *Spencer* (1972) 22 Cal.App.3d 786 [99 Cal.Rptr. 681], the court upheld a successful search for weapons in a cardboard box at the foot of a bed upon which the suspect was lying at the time of his arrest. (22 Cal.App.3d at p. 793.) In *People* v. *Arvizu* (1970) 12 Cal.App.3d 726 [90 Cal.Rptr. 895], a pre-*Chimel* search, the court indicated that search of a duffel bag was proper even under *Chimel* because the duffel bag was in the area of the arrestee's immediate control, and was an extension of his person, and because a search of that article for a weapon was legally permissible. (12 Cal.App.3d at pp. 729-730.)

More recently the United States Supreme Court has recognized *Chimel* as standing for the proposition that police "are normally permitted to seize evidence of crime when it is lawfully encountered." (*United States* v. *Edwards* (1974) 415 U.S. 800, 806 [39 L.Ed.2d 771, 777,

94 S.Ct. 1234].) In *Cupp* v. *Murphy* (1973) 412 U.S. 291 [36 L.Ed.2d 900, 93 S.Ct. 2000], that court upheld the search and seizure of scrapings from a detainee's fingernails. The opinion comments on *Chimel* as follows: "The Court recognized in *Chimel* that the scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement." (412 U.S. at p. 295 [36 L.Ed.2d at pp. 905-906], fn. omitted.) Here the rationale is that evidence in plain sight was concealed under observation of the officer, and it is only the retrieval of such evidence that we countenance.

It may be suggested that the officers should have placed the suspects into custody, secured a warrant, and returned to the scene. This presupposes unlimited personnel resources to watch the scene in the meantime lest a confederate designedly, an interloper unwarrantedly, or a chambermaid carelessly dispose of the evidence while the warrant is secured. To require the securing of a warrant under the particular circumstances of this case would be as out of place as in the situation reviewed by the court in *People* v. *McKinnon* (1972) 7 Cal.3d 899 [103 Cal.Rptr. 897, 500 P.2d 1097]. There the court considered the rationale of *Chambers* v. *Maroney* (1970) 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975], which had upheld the search of a vehicle for weapons and incriminating evidence after its occupants were arrested, upon probable cause, as the perpetrators of an armed robbery. Because of the original mobility of the car, the *Chambers* court observed, as noted by our Supreme Court, " 'Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the "lesser" intrusion is permissible until the magistrate authorizes the "greater." But which is the "greater" and which the "lesser" intrusion is itself a debatable question and the answer may depend on a variety of circumstances. *For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant.* Given probable cause to search, either course is reasonable under the Fourth Amendment. . . . The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event *there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained.*' (Italics added; fn. omitted.) (*Id.* [399 U.S.] at pp. 51-52 . . . .)" (7 Cal.3d at p. 908.) The *McKinnon* court ascribed the mobility of an automobile to a box or trunk

in transit, although as pointed out in the dissenting opinion the consigned article was not yet in transit. (7 Cal.3d at pp. 922-923.) In *McKinnon,* however, the probable cause arose from the officer's observation in plain sight of the contraband in a container opened under lawful authority by the carrier's agent, and the court alluded to the parallel to the plain sight rule. (See 7 Cal.3d at p. 915; and *People* v. *Lanthier* (1971) 5 Cal.3d 751, 757-758 [97 Cal.Rptr. 297, 488 P.2d 625].) To require a warrant to retrieve what was in plain sight is to overlook the fact that no search was necessary to discover the wallet, and that the entry into the bathroom and removal of the towels was an unsubstantial probing warranted by the prior observations of the officer.

Let a peremptory writ of mandate issue directing the trial court to vacate its order suppressing evidence.

Molinari, P. J., and Elkington, J., concurred.