[Crim. No. 4051. Fifth Dist. Jan. 18, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
RANDALL JAMES PRYSOCK, Defendant and Appellant.

974

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Richard G. Fathy, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold ,O. Overoye, Assistant Attorney General, Diana Beth Constantino, James T. McNally, Carla J. Caruso and Eddie T. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

FRANSON, Acting P. J.—Appellant, Randall James Prysock, aged 16 at the time of the offenses charged herein, was found guilty by jury of first degree murder of Iris Donna Erickson as charged in count one of an amended information. The jury also returned special findings that the murder was (1) wilful, deliberate and premeditated, and was personally committed by appellant during the commission of a robbery; and (2) was wilful, deliberate and premeditated and personally committed by appellant involving the infliction of torture. The jury also found the charge of using a deadly weapon in the murder was true. (Pen. Code, §§ 187, 190.2,[1] 12022, subd. (b).)

The jury also returned verdicts of guilty on the following charges: count two, robbery of Iris Donna Erickson with the use of a dangerous weapon (Pen. Code, §§ 211, 12022, subd. (b)); count three, burglary of the residence occupied by Iris Donna Erickson and accompanied with the use of a deadly weapon (Pen. Code, §§ 459, 12022, subd. (b)); count four, auto theft (Veh. Code, § 10851); count five, escape from a youth facility (Welf. & Inst. Code, § 871); and count six, destroying evidence (Pen. Code, § 135). Mark Danley, appellant's coparticipant and also a juvenile, was found guilty of the same charges in a later trial, including the special findings and an additional charge not relevant here.

The court sentenced appellant under count one to state prison for life without possibility of parole. The sentences on counts two and three, and their related enhancements, were stayed pursuant to Penal Code section 654. Additionally, the sentences for counts two through six were deemed to "merge into" and to run concurrently with the life sentence, and the execution of the sentences were stayed pursuant to then Penal Code section 669.

This is the second time this case has been before this court. On December 5, 1980, we reversed the trial court and ordered a new trial because of what we considered to be *Miranda* error (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) in that the warning given to appellant concerning his

---

[1]Appellant is accused of having committed the offenses on January 30, 1978, therefore, he is being tried under laws enacted by the Legislature in 1977. (Stats. 1977, ch. 316, § 9, pp. 1257-1258, eff. Aug. 11, 1977.)

right to consult with a free lawyer before police interrogation if he could not afford to hire one was inadequate. After granting the respondent's petition for certiorari, the United States Supreme Court held the *Miranda* warnings were adequate as a matter of federal law, reversed our decision and remanded the case to us "for further proceedings not inconsistent with this opinion." (*California* v. *Prysock* (1981) 453 U.S. 355, 362 [69 L.Ed.2d 696, 703, 101 S.Ct. 2806, 2810].)

For the reasons to be explained, we conclude appellant's conviction should be affirmed on all counts with the exception of count six, destroying evidence in violation of Penal Code section 135. We also modify appellant's sentence on the conviction of first degree murder (count one) to life imprisonment as required by *People* v. *Davis* (1981) 29 Cal.3d 814 [176 Cal.Rptr. 521, 633 P.2d 186] and Penal Code section 190 as it existed at the time of the commission of the instant offense. We also strike the special circumstances findings of the jury and remand for disposition of the Penal Code section 12022, subdivision (b) finding on count one (murder).

## FACTS

Brad Erickson, the victim's 16-year-old son, had reported a car theft of coparticipant Mark Danley some 4 months prior to the incidents in question. Danley subsequently made the boast that he was going to "take care of" Brad Erickson's mother, the murder victim. Appellant overheard this statement. Appellant had been (innocently) with Danley when he was arrested for this prior car theft.

Appellant testified to the following additional facts at trial after his unsuccessful motion to suppress his taped statement to the authorities on the night of his arrest. The appellant and Danley escaped from a juvenile detention facility during the evening of Saturday, January 28, 1978. Danley stole a vehicle in which the boys rode about in Tulare County on Sunday. Danley collided with a tree and set the interior on fire. The next day, Monday, appellant stole a Datsun pickup. Danley then drove it around the Town of Porterville. He drove to his house to obtain clothing and food, but did not stop because his mother was at home.

Danley then drove past the victim's house several times, saying that he knew where they could get food and clothes. The victim's car was apparently known to Danley; on that date it was at a repair shop. The

victim's son, Brad Erickson, had left in his pickup earlier to take some papers to a recycling center. The appellant and Danley stopped long enough to allow Danley to look in the garage. Danley made two separate telephone calls to an unknown number from a convenience store located near the house. According to appellant, there was no conversation over the telephone.

The pair then parked on a nearby street and walked to the rear of the house. Danley attempted to force entry by breaking out a window. When confronted by the victim, who was inside the house, both boys ran to the front of the house and entered through the front door.

When the victim announced that she was going to call the police, appellant hit her two or three times with a wooden dowel which he found near where he was standing in the living room. Danley then hit her with a metal fireplace poker, stabbed her in the back eight times with an ice pick to a consistent depth of one inch to one and one-quarter inch and eventually strangled her to death with a telephone cord.

After the murder, the boys stole a shotgun, food, money and tapes from the house. They also stole clothes which they changed into, subsequently burning the clothes which they wore at the time of the killing. Later that day, their vehicle, full of incriminating evidence, was spotted by the police resulting in a chase and their arrest.

### ■ The Miranda Warnings Were Adequate

Shortly after being taken to the police station, appellant was given a statement of his "*Miranda*" rights by Sergeant Byrd. Appellant declined to talk. The record does not reveal the exact content of the advisement.

Appellant's parents were called, and they came to the station. About 20 minutes after appellant had refused to talk, his mother entered the room where her son was located. She talked with him about 20 minutes. Appellant's mother exited and indicated appellant wished to discuss the events earlier in the day.[2] A few minutes after this Sergeant Byrd reentered the room where appellant was located; appellant's parents

[2]The facts suggest possible *Pettingill* error but none occurred. The mother came to the station house at police behest and requested permission to talk with her son. After 20 minutes of conversation, she then advised the police that her son was ready to talk (see *People v. Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108]).

followed. Byrd took a taped statement from appellant which was admitted into evidence. The tape reflects the following warnings were given to appellant prior to any questioning: "Sgt. Byrd: Okay. Mr. Randall James Prysock, earlier today I advised you of your legal rights and at that time you advised me you did not wish to talk to me, is that correct?

"Randall P.: Yeh.

"Sgt. Byrd: And, uh, since then you have asked to talk to me, is that correct?

"Randall P.: Yeh.

"Sgt. Byrd: And, uh, during, at the first interview your folks were not present, they are now present. I want to go through your legal rights again with you and after each legal right I would like for you to answer whether you understand it or not.... Your legal rights, Mr. Prysock, is follows:

"Number One, you have the right to remain silent. This means you don't have to talk to me at all unless you so desire. Do you understand this?

"Randall P.: Yeh.

"Sgt. Byrd: If you give up your right to remain silent, anything you say can and will be used as evidence against you in a court of law. Do you understand this?

"Randall P.: Yes.

"Sgt. Byrd: *You have the right to talk to a lawyer before you are questioned, have him present with you while you are being questioned, and all during the questioning. Do you understand this?*

"Randall P.: *Yes.*

"Sgt. Byrd: You also, being a juvenile, you have the right to have your parents present, which they are. Do you understand this?

"Randall P.: *Yes.*

"Sgt. Byrd: Even if they weren't here, you'd have this right. Do you understand this?

"Randall P.: Yes.

"Sgt. Byrd: *You all, uh—if,—you have the right to have a lawyer appointed to represent you at no cost to yourself. Do you understand this?*

"Randall P.: *Yes.*

"Sgt. Byrd: Now, having all these legal rights in mind, do you wish to talk to me at this time?

"Randall P.: Yes." (Italics added.)

At this point, at the request of Mrs. Prysock, a conversation took place with the tape recorder turned off. According to Sergeant Byrd, Mrs. Prysock asked if appellant could still have an attorney at a later time if he gave a statement at that time without one. Sergeant Byrd assured Mrs. Prysock that appellant would have an attorney when he went to court and "he could have one at this time if he wished one."[3]

The United States Supreme Court ruled in *California* v. *Prysock, supra*, 453 U.S. 355, 361 [69 L.Ed.2d 696, 702, 101 S.Ct. 2806, 2810], that Sergeant Byrd "fully conveyed to [appellant] his rights as required

---

[3]The tape reflects the following concerning the off-the-record discussion:
"Sgt. Byrd: Okay, Mrs. Prysock, you asked to get off the tape, . . . During that time you asked, decided you wanted some time to think about getting, whether to hire a lawyer or not.
"Mrs. P.: 'Cause I didn't understand it.
"Sgt. Byrd: *And you have decided now that you want to go ahead and you do not wish a lawyer present at this time?*
"Mrs. P.: That's right.
"Sgt. Byrd: And I have not persuaded you in any way, is that correct?
"Mrs. P.: No, you have not.
"Sgt. Byrd: And, Mr. Prysock, is that correct that I have done nothing to persuade you not to, to hire a lawyer or to go on with this?
"Mr. P.: That's right.
"Sgt. Byrd: Okay, everything we're doing here is strictly in accordance with Randall and yourselves, is that correct?
"Mr. P.: That is correct.
"Sgt. Byrd: Okay. Uh, all right, Randy, I can't remember where I left off, I think I asked you, uh, with your legal rights in mind, do you wish to talk to me at this time? *That is with everything I told you, all your legal rights, your right to an attorney,*

by *Miranda*. He was told of his right to have a lawyer present prior to and during interrogation, and his right to have a lawyer appointed at no cost if he could not afford one. *These warnings conveyed to [appellant] his right to have a lawyer appointed if he could not afford one prior to and during interrogation.* The Court of Appeal erred in holding that the warnings were inadequate simply because of the order in which they were given." (Italics added, fn. omitted.)

The Supreme Court noted it had never suggested "any desirable rigidity in the *form* of the required [*Miranda*] warnings. [¶] Quite the contrary, *Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures...." (*California* v. *Prysock, supra*, 453 U.S. at p. 359 [69 L.Ed.2d at p. 701, 101 S.Ct. at p. 2809].) The *Prysock* warnings were then deemed to be "a fully effective equivalent" to the precise warnings required by *Miranda*. (*Ibid.*)

The high court distinguished *People* v. *Bolinski* (1968) 260 Cal. App.2d 705 [67 Cal.Rptr. 347], which was relied on by this court in our prior unpublished *Prysock* opinion. It was emphasized that Sergeant Byrd's warnings concerning appointed counsel were not linked to a future point in time after police interrogation such as "if he [were] charged" as in *Bolinski* or at arraignment or trial as in *United States* v. *Garcia* (9th Cir. 1970) 431 F.2d 134. "Here ... nothing in the warnings given [appellant] suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general, including the right 'to a lawyer before you are questioned ... while you are being questioned, and all during the questioning.'" (*California* v. *Prysock, supra*, 453 U.S. at pp. 360-361 [69 L.Ed.2d at p. 702, 101 S.Ct. at p. 2810].)

This court in its first opinion also relied on *People* v. *Stewart* (1968) 267 Cal.App.2d 366 [73 Cal.Rptr. 484] in holding Sergeant Byrd's warnings to appellant were inadequate under *Miranda*. In retrospect, we believe the reliance was misplaced for two reasons: First, *Stewart* is distinguishable in that there the officer told the defendant "'... that he had a right to an attorney, and he could have his attorney *here*; ... [that] he had a right to have the Public Defender appointed in case he couldn't afford an attorney; ...'" (*Id.*, at p. 378, fn. 16.) The reviewing court in *Stewart* invalidated the warnings on the ground that informing

your right, and your right to remain silent, and all these, I mean *do you wish to talk to me at this time about the case?*
"Randall P.: *Yes.*" (Italics added.)

the defendant he had a right to an attorney "here" did not make clear his right to an attorney during interrogation. "... the warning could well have been interpreted to mean no more than that the court appointed attorney would, at some *future time*, visit defendant in jail. This is not the equivalent of telling him that the interrogation would suspend until the attorney arrived." (*Id.*, at p. 378, italics added.) As emphasized by the United States Supreme Court, in the instant case appellant was explicitly told of his right to have an attorney present "'before you are questioned, ... while you are being questioned, and all during the questioning.'" (*California* v. *Prysock, supra*, 453 U.S. at p. 361 [69 L.Ed.2d at p. 702, 101 S.Ct. at p. 2810].)

Second, if the *Stewart* warnings are not truly distinguishable from the warnings given in the present case, i.e., the right to an attorney "here" carries the same impact as the right to an attorney before and during interrogation, then *Stewart* was wrongly decided. The *Stewart* warnings adequately conveyed to the defendant his right to a free lawyer during interrogation as explained in *California* v. *Prysock*.

Both *Bolinski* and *Stewart* were decided by the California Court of Appeal on federal grounds.

Appellant now urges this court to hold that Sergeant Byrd's warnings to him were inadequate as a matter of state law, i.e., that the warnings do not comply with the prohibition against self-incrimination guaranteed to the people of California under article I, section 15 of our state Constitution. (*People* v. *Pettingill, supra*, 21 Cal.3d 231, 237; *People* v. *Disbrow* (1976) 16 Cal.3d 101, 114-115 [127 Cal.Rptr. 360, 545 P.2d 272]; *People* v. *Norman* (1975) 14 Cal.3d 929, 939, fn. 10 [123 Cal.Rptr. 109, 538 P.2d 237].) Appellant argues that unless such a holding is made "the [United States] Supreme Court decision in this case encourages [police officers] to throw away their *Miranda* cards and *ad lib* the warnings, with severe adverse results." (Italics original.) Appellant's argument is unduly pessimistic—it is reasonable to assume law enforcement will continue to use the standard *Miranda* warning cards in order to be sure the language used to advise suspects of their rights will be able to withstand later court scrutiny. If officers begin to vary from the standard language, their burden of establishing that defendants have been adequately advised before waiving their rights will increase substantially as evidenced by the present case. If Sergeant Byrd had read appellant his rights from the *Miranda* card, we would not be faced with the question of the adequacy of the warnings.

Appellant directs this court's attention to a recent law review article which showed that 55.3 percent of juveniles and 23.1 percent of adults tested did not adequately understand at least one of the four *Miranda* warnings and, significantly, that the most frequently misunderstood *Miranda* warning for both samples was the statement that a suspect has the right to consult an attorney before interrogation and to have an attorney present during interrogation. (Grisso, *Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis* (1980) 68 Cal.L.Rev. 1134, 1153-1154 (hereinafter cited as *Juveniles' Capacities to Waive Miranda*).) Appellant contends these numbers will only increase when the police start "extemporizing the warnings," rather than stating them in the language of *Miranda.*

However, we note the Grisso study also concluded that most suspects adequately understood the warning that the court would appoint an attorney if the suspect cannot afford one (juveniles 85.6 percent; adults 85.4). (*Juveniles' Capacities to Waive Miranda, supra*, at p. 1154.) The study further concluded that while 16 year olds' comprehension of their rights was significantly below that of adults age 23 and over, it was not below the performance of persons age 17 to 20 years old. (*Juveniles' Capacities to Waive Miranda, supra*, at p. 1157.) Finally, while the study concluded prior court experience bore no direct relationship to understanding the words and phrases in the *Miranda* warning (e.g., consult, interrogation, appoint, entitled, right), prior court experience was related to increased understanding of the function and significance of the right to remain silent and the right to counsel. (*Juveniles' Capacities to Waive Miranda, supra*, at p. 1160.)

We should keep in mind that this was not appellant's first brush with the law; he had previously been arrested on an armed robbery charge and an attorney had been appointed to represent him. He had been advised of his *Miranda* rights in connection with that charge. In the present case, he had been given his "*Miranda* rights" by Sergeant Byrd about 30 minutes before his parents arrived at the police station, and he refused to talk with the police.

While we fully recognize that the *Miranda* doctrine, as incorporated in California law, is not limited to the United States Supreme Court holdings interpreting *Miranda* as a matter of federal law (see *People v. Pettingill, supra*, 21 Cal.3d 231, 237; *People v. Disbrow, supra*, 16

Cal.3d 101, 114-115),[4] we decline to nullify the warnings in the present case under the California Constitution (art. I, § 15) contrary to the holding of the United States Supreme Court.

The importance of deference by state courts to constitutional interpretations of the United States Supreme Court, particularly where the language of the federal and state constitutional provisions are virtually identical, as in the present case,[5] is forcefully explained by Justice Richardson in his dissenting opinion in *People* v. *Disbrow, supra*, 16 Cal.3d 101, 118-121. Absent a showing of some unique or distinctive California conditions which would justify a departure from a general principle favoring uniformity, Justice Richardson states: "[W]e should defer to the leadership of the nation's highest court in its interpretation of nearly identical constitutional language, ... The reason for the foregoing principle is that it promotes uniformity and harmony in an area of the law which peculiarly and uniquely requires them. The alternative ... must inevitably lead to the growth of a shadow tier of dual constitutional interpretations state by state which, with temporal variances, will add complexity to an already complicated body of law.

"The vagaries and uncertainties of constitutional interpretations, particularly in the Fourth and Fifth Amendment sectors of our criminal law, are the hard facts of life with which the general public, the courts, and law enforcement officials must grapple daily. This condition necessarily breeds uncertainty, confusion, and doubt. It will not be eased or allayed by a proliferation of multiple judicial interpretations of nearly identical language." (*Id.*, at p. 119.)

We also note that our California Supreme Court in a similar situation (reversal and remand of its own case by the United States Supreme Court) entered a minute order upholding a trial court's ruling, which

---

[4]*People* v. *Pettingill, supra*, 21 Cal.3d 231, contrary to *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321], held inadmissible a confession which was the product of custodial interrogation by police after defendant had twice invoked his right to remain silent. *People* v. *Disbrow, supra*, 16 Cal.3d 101 held, contrary to *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], that a statement inadmissible in the case-in-chief because it was obtained in violation of *Miranda* could not be used to impeach defendant's trial testimony.

[5]The federal Constitution Fifth Amendment provides: "No person ... shall be compelled in any criminal case to be a witness against himself, ..." The California Constitution, article I, section 15 provides: "Persons may not ... be compelled in a criminal cause to be a witness against themselves, ..."

was a reversal of its own earlier opinion. *In re Michael C.* (1978) 21 Cal.3d 471 [146 Cal.Rptr. 358, 579 P.2d 7] reversed a trial court's admission of a juvenile's incriminating statements in light of the fact the juvenile asked to see his probation officer after being given his *Miranda* rights; the California Supreme Court found this to be a per se invocation of Fifth Amendment rights in the same way a request for an attorney was found in *Miranda* to be. The United States Supreme Court reversed and remanded in *Fare* v. *Michael C.* (1979) 442 U.S. 707 [61 L.Ed.2d 197, 99 S.Ct. 2560] after noting "the judgment of the California Supreme Court rests firmly on that court's interpretation of *federal law.*" (442 U.S. at pp. 716-717 [61 L.Ed.2d at p. 207, 99 S.Ct. at p. 2567], italics added.) The United States Supreme Court noted the per se aspect of *Miranda* was based on the unique role the lawyer plays in the adversarial system of criminal justice and did not extend to a probation officer, who was not in the same posture with regard to either the accused or the system of justice as a whole. (442 U.S. at pp. 719-720 [61 L.Ed.2d at p. 209, 99 S.Ct. at pp. 2569-2570].) On remand the California Supreme Court entered a minute order affirming the trial court's judgment. (Minutes of the Supreme Court, Apr. 17, 1980.)

In short, the high court of our land—the very court which created the *Miranda* rules—has declared the sufficiency of the warnings given to appellant by Sergeant Byrd. As an intermediate state appellate court, we should abide by this holding. We therefore find appellant was adequately advised of his right to consult with a court-appointed attorney if he and his parents could not afford one before he was questioned by Sergeant Byrd.

■ *Appellant's Statement Was Freely and Voluntarily Given*

■ On appeal, the question of the voluntariness of a confession is based upon a review of the totality of circumstances surrounding the statements. (*Fare* v. *Michael C., supra*, 442 U.S. 707, 724-725 [61 L.Ed.2d 197, 212, 99 S.Ct. 2560, 2571-2572]; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 576 [75 Cal.Rptr. 642, 451 P.2d 74], cert. dism. (1969) 394 U.S. 1025 [23 L.Ed.2d 743, 89 S.Ct. 1646]; *In re Cameron* (1968) 68 Cal.2d 487, 498 [67 Cal.Rptr. 529, 439 P.2d 633].) The record must contain evidence from which the trial judge could have found beyond a reasonable doubt that the statement at issue was the product of a knowing and intelligent waiver of defendant's *Miranda* rights. (*People* v. *Braeseke* (1979) 25 Cal.3d 691, 701 [159 Cal.Rptr. 684, 602

P.2d 384], judgment vacated cause remanded (1980) 446 U.S. 932 [64 L.Ed.2d 784, 100 S.Ct. 2147], reiterated (1980) 28 Cal.3d 86 [168 Cal.Rptr. 603, 618 P.2d 149], cert. den. (1981) 451 U.S. 1021 [69 L.Ed.2d 395, 101 S.Ct. 3015]; cf. *People* v. *Jimenez* (1978) 21 Cal.3d 595, 608 [147 Cal.Rptr. 172, 580 P.2d 672].) A reviewing court must examine the uncontradicted facts in the record to determine independently whether the trial court's finding of intelligent waiver was properly made. As to conflicting testimony, the reviewing court must accept that version of events which is most favorable to the People, to the extent that it is supported by the record. (*Id.*, at p. 609.)

Appellant was 16 years old at the time of the offense. ■ However, a minor can effectively waive his constitutional rights. In *People* v. *Lara* (1967) 67 Cal.2d 365, 377-378 [62 Cal.Rptr. 586, 432 P.2d 202], an 18 year old, with a mental age of less than 10 1/4 years, was held to have intelligently and understandingly waived his rights. The court held that a minor does not lack the capacity as a matter of law, even in a capital offense, to waive his rights and that the voluntariness of a confession is determined by the totality of the circumstances, including education, age, experience and ability to comprehend the meaning and effect of confession. (*Id.*, at p. 383.)

■ No evidence of appellant's blood alcohol content was admitted during the hearing, although reference was made to a blood alcohol having been drawn from appellant at trial. After his mother questioned him about drinking, he stated he was "dizzy." He further stated he had not eaten in two days.[6]

---

[6]Mrs. Prysock, appellant's mother, testified that the following occurred after her arrival at the police station on January 30, 1978: "Q. [Defense counsel] When you went into the room where Randy was located, what was Randy doing?

"A. He was sitting in this chair that looked like a school desk type. And he had his head laying down on the desk. And he was handcuffed. And his handcuffs were on the chair and his head was on the desk with his head laying down.

"Q. Who spoke first, you or Randy?

"A. I did.

"Q. What did you say?

"A. I said, 'Randy, mother is here.'

"Q. What did he say?

"A. Then I said—he still didn't raise his head up. I said, 'Son, what is wrong?' He said, 'I am sick, dizzy.'

"Q. What did he say next?

"A. I said, 'Well, what is the matter?' He said, 'Well, Mom, I haven't eaten in three days. I haven't slept in three days.'

However, as respondent notes, Sergeant Byrd testified that while appellant had a red, runny nose and that his eyelids were red, like someone who had been crying, appellant was not unsteady on his feet, did not smell of alcohol and there was nothing else unusual in his speech or appearance. And while appellant may well have been tired and hungry, it does not appear appellant or his parents asked for anything for appellant to eat or for appellant to be able to rest before the interview, which was initiated by his mother. Furthermore, the boys did have food with them in the stolen van they traveled in on January 30.

Appellant appears somewhat "tired" on the tape,[7] but there is nothing in his responses to Byrd to show that he was frightened into submission by Byrd's, or the arresting officer's, behavior. Indeed, appellant first refused to talk with the authorities at the time *closer* to the arrest, when it is logical to believe appellant would have been most intimidated as a result of any action taken at the time of his arrest.

After refusing to waive his *Miranda* rights initially, Byrd apparently called appellant's parents because appellant was a juvenile (Byrd was acquainted with Mr. Prysock). Appellant was never held "incommunicado." After speaking with her son alone for approximately 20 minutes, Mrs. Prysock indicated appellant wished to talk and this is established by appellant on the tape.

The prosecution has an especially heavy burden to show that once a defendant has invoked his rights, any subsequent questioning must be shown to be the product of a knowing and intelligent waiver. (*People* v. *Braeseke, supra*, 25 Cal.3d at p. 702.) However, the transcript of the tape shows that when Sergeant Byrd asked appellant if he had subsequently asked to talk to him after initially refusing to do so, appellant responded "yes." At the hearing on the admissibility of appellant's confession during trial, appellant and his mother both stated the renewed questioning was her idea and appellant had just gone along with her.

Appellant and both his parents further argued "involuntariness" as a result of not having been properly advised of their right to a free attor-

---

"Then I looked him in the face. And I said, 'Well, something else is wrong, Randy.' You know, 'you are not acting right. Your eyes are red.' And I said, 'Son, have you been drinking or taking drugs?'
"Q. What did he say?
"A. He says, 'No, we have been drinking.'"
[7]The actual tape of appellant's statement to Byrd was made part of the record on appeal.

ney prior to questioning. Although Mr. and Mrs. Prysock and appellant testified they did not understand that if appellant could not afford to hire a lawyer one would not only be appointed at no cost but *prior* to questioning, Mrs. Prysock admitted appellant's armed robbery involvement the previous month was handled by an appointed private attorney.[8] The trial court's reasoning in finding appellant knowingly and intelligently waived his *Miranda* rights is set forth in the margin.[9]

As did the trial court, we find that appellant's confession was the product of his own volition and not the result of pressure or coercion by the officers. The evidence shows that appellant was fully aware of his rights and was not frightened into submission by the officer's behavior or questioning. (*People v. Davis, supra,* 29 Cal.3d 814, 825.) Viewing

[8]The armed robbery was committed December 11, 1977, with Mark Danley. Despite appellant's contrary contention, at the time of arrest on the robbery charge on December 11, 1977, appellant orally waived his *Miranda* rights and then signed a written waiver.

[9]"THE COURT: All right. I have considered all of the evidence and number of points and authorities. And the main issue, of course, is ... the ability of the Prysock's ability to reason ... and comprehend or resist were so disabled that he was incapable of free or rational choice in deciding to make a statement to Detective Byrd. And, of course, considering what disability there was, if any, would be the lack of sleep, whether he had eaten, how long since he had eaten, and the extent of any intoxication.

"I have considered these in light of some case[s], *People v. Lara,* 67 Cal.2d 365; *In re Cameron,* 68 Cal.2d 487; the *Morris* case cited by counsel; and *People v. S[ch]wartzman* (1968) 266 Cal.App.2d 870 [72 Cal.Rptr. 616].

"It is my opinion after hearing the totality of the evidence that Prysock was cognizant and aware of rights that he was being advised of by Detective Byrd. His responses to questions regarding Miranda rights appear on the tape to be rational, coherent and responsive. Appears to this Court that his decision to proceed and answer questions as asked by Detective Byrd was [the] product of his rational intellect and his free will. [¶] I feel, therefore, that his statement that he gave was voluntary and knowing.

"And [in the] S[ch]wartzman case it is pointed out that the minor's capacity to waive his rights, for instance, the attorney, one of the basic *Miranda* rights, is a function of his individual intelligence, compensability [*sic*]. Unrelated to the desires or wishes of his parents.

"But [what] the Court was pointing out is [a] minor makes the ultimate decision as to whether or not he is going to waive his rights or not, regardless of what his parents may want to do or not want to do.

"In this case, it appears to the Court that Prysock was freely advised; that he indicated that he understood; and that he would waive this right, these rights under *Miranda,* and proceed to make the statement.

"As I mentioned, I took into consideration what drinking he had been doing, the lack of sleep and other matters. And I cannot see from the evidence that they would have impaired, only [*sic*] appreciable degree or only [*sic*] ability to interfere with his rational intellect and his free will. And for that reason, I feel that his statement that he gave to Detective Byrd was voluntary.

"There are some other cases, but they are merely on the extent of the blood alcohol. And that apparently wasn't gone into in this case. I don't know what his blood alcohol was."

the disputed facts in the light most favorable to the prosecution, we agree with the trial court that the confession was voluntarily given.

### ■ *Sufficient Evidence Supports Appellant's Conviction of Premeditated First Degree Murder*

Appellant charges there was no evidence of premeditation and deliberation and the first degree finding "may have involved the jury's determination that [appellant] premeditated and deliberated Mrs. Erickson's killing; ..." The jury was instructed on several theories of first degree murder—(1) wilful, premeditated and deliberated; (2) first degree felony murder under two theories—burglary and robbery;[10] (3) murder by torture. As previously noted, the jury found appellant guilty of first degree murder with use of a deadly weapon and further found both special circumstances to be true.

The jury was instructed pursuant to CALJIC No. 8.20 regarding deliberate and premeditated murder and a special instruction on degree of reflection required by the concept.[11]

---

[10]The jury was cautioned on the robbery theory that the specific intent to rob must have been formed *prior* to infliction of the fatal wounds.

[11]CALJIC No. 8.20 stated at time of trial: "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with malice aforethought is murder of the first degree. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand.

"If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill."

The special instruction stated as follows: "*Special Instruction A—Degree of Reflection—Deliberation and Premeditation versus Intent to Kill* [¶] In order to find a deliberate and premeditated killing you must find substantially more reflection on the part of the defendant than is involved in the mere formation of the specific intent to kill."

The jury was also instructed on a theory of aiding and abetting in the commission of a crime (CALJIC Nos. 3.00, 3.01) and that mere presence at the scene of the commission of the offense and failure to take steps to prevent a crime do not establish aiding and abetting. (*People* v. *Hill* (1946) 77 Cal.App.2d 287, 294 [175 P.2d 45].)

In *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942] the California Supreme Court suggested three factors which might lead an appellate court to sustain a finding of premeditated murder: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing— what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' (*People* v. *Thomas, supra*, 25 Cal.2d 880, at pp. 898, 900, 901 [156 P.2d 7]); (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3) . . . ." (*Id.*, at pp. 26-27.)[12]

The entire record in the present case, viewed in the light most favorable to the prosecution (see *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781, 2789]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]), affords a sufficient basis upon which the jury could infer that appellant's in-

---

[12]The *Anderson* analysis regarding premeditation continues to be utilized by the Supreme Court as recently as *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 749-750 [175 Cal.Rptr. 738, 631 P.2d 446].

volvement in the killing of Mrs. Erickson was not a rash, impulsive act but a product of premeditation under the *Anderson* analysis.

As to the first type of evidence—facts showing prior planning activity—appellant himself admitted on tape and at trial that he was present with coparticipant Danley in juvenile hall when Danley told one Roy Hipp that he was going to "take care of" Brad Erickson's mother. This was sometime in the 45 days preceding Mrs. Erickson's death.[13] Detective Bill Lyon also testified to an early morning conversation with appellant on January 31 in which appellant talked about Danley's "plan."

Appellant testified he and Danley ended up at what he only later found out was the Erickson house, two days after their escape from Meyers Youth Center, because Danley's mother was apparently present in the Danley home when the boys drove by there in search of food and clothing. Appellant further testified neither he or Danley thought anyone was at home in the Erickson residence when they tried to break in the back window.[14] However, as pointed out by respondent, the two did

---

[13]The pertinent taped testimony is as follows:

"Sgt. Byrd: Okay. You were telling me earlier, or, uh, something about you met a guy in, in camp. And that's just before I walked in, this was just something you blurted out to me, uh, as we was coming in here. What, what was this, I don't recall exactly what it was. Something about somebody in camp give you an idea to do it or something. What was this?

"Randall P.: Oh, I said Mark [Danley] told Hipp that his plans, what he was going to do.

"Sgt. Byrd: Okay, now, who is Hipp?

"Randall P.: Roy Hipp.

"Sgt. Byrd: And where'd you meet him at?

"Randall P.: At Juvenile Hall.

"Sgt. Byrd: And how long ago was this?

"Randall P.: About three, two or three weeks.

"Sgt. Byrd: And what did Mark tell this guy that he was going to do?

"Randall P.: He told him what all he was going to do was rob, and what he was going to do to Brad Erickson's mom.

"Sgt. Byrd: What'd he say he was going to do to her?

"Randall P.: Kill her.

"Sgt. Byrd: Well, why, how, why did he want to kill her?

"Randall P.: I don't know. He never did tell me.

"Sgt. Byrd: Are these things that you're telling me the truth?

"Randall P.: Yes. . . ."

[14]The dissent's conclusion that a reasonable trier of fact could only find appellant and his coparticipant had attempted to avoid the victim prior to the time she discovered Danley breaking the rear window is based on appellant's self-serving testimony on this issue. The frequent drive-bys and phone calls which purportedly involved no conversation are susceptible to a dual interpretation—the other being that appellant and Danley were waiting until the victim's son departed and they could find the victim alone at the house.

enter the house after ascertaining Mrs. Erickson was home. Mrs. Erickson was then killed, the house ransacked, and the boys changed and gone within an hour.

As to the second category, facts suggesting motive, appellant was with Danley in 1977 when Danley was arrested for auto theft. (There is no indication in the record that any charges were ever filed against appellant stemming from this event.) This was the car Danley had tricked Brad Erickson into leaving and that Brad had reported as being stolen to the highway patrol. However, appellant did not know Brad Erickson and Brad Erickson did not know appellant prior to his mother's death.

The final category—facts about the manner of the killing which suggest a preconceived design—also accords with the *Anderson* requirements. Mrs. Erickson was attacked with a variety of objects—a wooden stick (by appellant), a fireplace poker (by Danley) and finally an ice pick (by Danley). Mrs. Erickson was beaten about the head with the fireplace poker and stabbed numerous times in the back with the ice pick (apparently in a rhythmic motion since the stab wounds were of a consistent depth). The cause of death was strangulation by a telephone cord that had been "cut" in two places with a knife from a nearby telephone. In *People* v. *Cruz* (1980) 26 Cal.3d 233, 245 [162 Cal.Rptr. 1, 605 P.2d 830], the court concluded that the victim's killing, perpetrated by blows to only the head and by a shotgun blast in the victim's face "permit[ted] the jury to infer that the manner of killing was so particular and exacting that defendant must have killed intentionally according to a preconceived design and for a reason." (*Ibid.*) The instant case presents evidence of an equally deadly beating that was pursued until Danley, and perhaps appellant, was assured the victim was indeed dead, not just unconscious.

The evidence supports a finding that appellant was present for the purpose of encouraging and assisting Danley in killing Mrs. Erickson[15] and that he knew of Danley's purpose in entering Mrs. Erickson's house, i.e., to kill Mrs. Erickson.

---

[15]As noted *ante*, "mere presence alone at the scene of the crime is not sufficient to make the accused a participant, and while he is not necessarily guilty if he does not attempt to prevent the crime through fear, such factors may be circumstances that can be considered by the jury with the other evidence in passing on his guilt or innocence." (*People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198].)

 *The Prosecution Was Not Guilty of Prejudicial Misconduct During Closing Argument*

Appellant first argues the prosecutor improperly argued his personal beliefs and cites the excerpts noted in the margin.[16]

Appellant argues not so much that the statements were improper expressions of personal opinion, but that "the prosecutor certainly should not have made *these many* expressions of personal opinion." (Italics added.)

---

[16]The portions of the following excerpts which are underscored indicate the language complained of by appellant:

(1) "The People of the State of California in every single one of the counts that we've charged, believe the defendant to be guilty."

(2) "In connection with that, again, Mr. Prysock's remorse on the stand here in front of you 12 who are going to judge him doesn't ring true to his actions after the murder. He puts 26 quarters of Mrs. Erickson's money that she got from her job as an L. A. Times distributor and puts it in his pocket. Okay. I don't know about you, but if I would have walked up to that scene like Mrs. Erickson's son did, I probably would have puked my guts out, much less witnessing the event."

(3) "Burglary is the entering of a dwelling house with the intent to commit larceny or any other felony. Once I get inside that house, it's burglary, it's burglary. Now, if I take something once I get inside that house—I've prosecuted a jillion of these—that shows some intent on the part of the person who came in the house to show that he did have that intent when he came in. The fact that he took something shows that circumstantially."

(4) "If you come to the ridiculous conclusion that Prysock had the intent to commit burglary and that attempt to commit that burglary was frustrated and that when he ran around the house and went in that front door he didn't have the intent to commit burglary, then you just let him walk right out of here. That to me—if you believe that, I—words don't describe my feelings on that particular point."

(5) "[Defense counsel] says there's no evidence of any intent to kill when Prysock entered that house, and I don't believe that's true. I don't believe it's true that Mr. Prysock didn't know all about Brad Erickson, Brad Erickson's mother, Phinnis Ralph [*sic*] the guy that Danley stole that pickup from; it's incredible.

"[Defense counsel]: Your Honor, excuse me. It's unclear to me whether or not counsel is stating his personal opinion or stating it based on the evidence.

"[Prosecutor]: My personal opinion based on the evidence, your Honor.

"[Defense counsel]: Thank you."

(6) "Now, a person accused of murder, it's not unusual for them to get up and lie on the stand. Okay. But Mr. Prysock says on the stand that he didn't hit—excuse me—he doesn't remember where he hit Mrs. Erickson when he hit her in the chair. He doesn't remember which part of the body. He just doesn't remember. His memory fails him on that point. On the taped statement he says he hit her on the head. Why doesn't he just come out and state it?"

(7) "This type of conduct in this particular case, in my opinion, is one of the most brutal and atrocious crimes that's ever been committed in this county, and you may live a long time before you'll hear about one more depraved than this one."

(8) "This is a crime that certainly deserves the charges we brought, and beyond any reasonable doubt they're true."

■ It is "within the domain of legitimate argument for a prosecutor to state his deductions or conclusions drawn from the evidence adduced at trial, and, more particularly, to relate to the jury that, in his opinion, the evidence shows that the defendant is guilty of the crime charged." (*People* v. *Dillinger* (1968) 268 Cal.App.2d 140, 144 [73 Cal.Rptr. 720].) He may also comment on the credibility of a witness in light of all the evidence presented. (*People* v. *Roberts* (1966) 65 Cal.2d 514, 520 [55 Cal.Rptr. 412, 421 P.2d 420], mod. on another point in *In re Roberts* (1970) 2 Cal.3d 892, 893 [87 Cal.Rptr. 833, 471 P.2d 481].)

■ Most of the statements made, when taken in context, relate to the evidence, or inferences reasonably arguable from the evidence. While statements relating to the brutal and nauseating nature of the crime were overstated and unnecessary, they are not susceptible to an inference that the prosecutor's opinion was based on information other than evidence adduced at trial.[17] Language even more inflammatory has been held permissible (e.g., *People* v. *Thornton* (1974) 11 Cal.3d 738, 762-763 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on another point in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1]).

Importantly, none of the cited statements elicited an objection below. (No. 5 in fn. 16, *ante,* was not an objection but a request for clarification.) Therefore *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468], precludes raising this issue for the first time on appeal, since a timely admonition would have "cured" any harm from the statements if they were even deemed to constitute misconduct.

■ One additional incident remains to be discussed. The prosecutor stated as follows: "Now, as defense counsel points out, Mr. Danley's not here. He hasn't testified in this trial. I'll have my turn with Mr. Danley on the 31st of July. Mr. Danley has a Fifth Amendment privilege not to come in here and testify. Okay. If Danley would have made any statement to the police admitting striking Mrs. Erickson, you'd heard about it in court." Defense counsel objected and counsel then approached the bench with the reporter. The prosecutor maintained that such a state-

---

[17]It should further be noted that the prosecutor opened his closing argument to the jury with the following comment: "[A]nything I say is only my opinion of what I feel the evidence shows. The evidence shows certain things; from these things you can infer that other things have happened. Throughout the course of my argument I will be giving you my opinions from what I feel the evidence shows. I've already formed my opinion in this case; you have not."

ment, if made, would have been a declaration against penal interest and admissible if Danley had been called to testify and then testified. Defense counsel maintained it would have been unethical for him to call Danley in light of the previous trial severance and relied on Evidence. Code section 930. After a few minutes discussion, the court sustained the defense objection and admonished the jury as follows: "The defense objection is well taken and the jury should disregard it in regard to calling Danley. [¶] Remember what I told you at the outset, this is argument and it is not evidence. Keep that in mind, jurors. Again, I'd also advise you that if you don't agree with any [of] the attorney's versions of the fact or recollection, why, that's your purview, because you are the triers of facts, not us."

Respondent contends and we agree that if the remark constituted misconduct, the prompt admonishment cured any harm. Even if we should find the statement to have been misconduct, the test of prejudice is whether it is "reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant. [Citations.]" (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].)

We find that any reasonable jury would have reached the same verdict even in the absence of the prosecutor's remarks.

### *Appellant's Conviction Under Penal Code Section 135 (Destruction of Evidence) Was Improper*

Penal Code section 135 provides: "Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is *about to be produced in evidence* upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor." (Italics added.)

Appellant contends that the evidence is insufficient to establish that the clothing and shoes burned by himself and Danley after the crime were "about to be produced" in evidence and/or that he so knew.

Respondent asserts that the evidence sufficed because the clothing was burned after crimes as to which the clothing would be evidence and

because appellant knew that an investigation was imminent or in progress.

In *People* v. *Fields* (1980) 105 Cal.App.3d 341 [164 Cal.Rptr. 336], this court affirmed a conviction for violation of section 135, where the defendant, a county jail inmate, flushed marijuana down a jail toilet after a deputy sheriff had discovered the drug and seized it during a routine search. This court held that the statute applies to evidence seized in the course of a police investigation, even though no formal legal proceedings were pending: "Again, appellant's interpretation is contrary to the fair import of the statute; it ignores the words 'or investigation *whatever*' (italics added). The seizure and examination of the marijuana by Deputy Ray was an authorized police investigation of possible criminal activity in the jail. It must be presumed that once the deputy had satisfied himself as to the nature of the article seized, he would have reported the incident to his superiors and the articles would have been sequestered for possible use in a future criminal prosecution of the jail inmates.

"Appellant, a prisoner in the county jail, obviously knew that possession of marijuana was unlawful and that he and his fellow inmates could be prosecuted for possessing the marijuana. Thus, when appellant grabbed the contraband from Officer Ray and flushed it down the toilet, he intentionally destroyed the contraband to prevent it from being 'produced in evidence' at a 'trial, inquiry or investigation ....' The contemplated statutory inquiry and investigation had commenced when Deputy Ray seized the evidence." (*Id.*, at pp. 345-346.)

*Fields* relied on dicta in *People* v. *Superior Court* (*Reilly*) (1975) 53 Cal.App.3d 40 [125 Cal.Rptr. 504], which held "where the suspect, in fear of imminent disclosure or arrest, is observed to secrete an article, which if left in plain sight would have been subject to seizure, there was no constitutionally unreasonable search or seizure in retrieving that article from the place where the suspect was observed to have placed it." (*Id.*, at p. 48.) A police officer, through a motel window, saw defendant's confederate working with a camera and driver's license. After the officers made their presence known, defendant was observed to hide a wallet and what appeared to be a traveler's checks container. The officers entered and arrested the counterfeiters. The court remarked at page 49: "It must also be borne in mind that it is a criminal offense to destroy or conceal evidence. (Pen. Code, § 135. See *People* v. *Mijares, supra*, 6 Cal.3d 415, 422; and *People* v. *Lee* (1970) 3 Cal.App.3d 514,

526 .... Cf. *People* v. *Edgar* (1963) 60 Cal.2d 171, 174-175 ....)
Here, unlike *People* v. *Edgar, supra*, there was an attempt to conceal
the evidence witnessed by the officers. It would be incongruous to pro-
hibit the officers from seizing evidence of the misdemeanor which was
committed in their presence, while at the same time upholding their
right to arrest the perpetrator." (Fn. omitted.)

Both *Fields* and *Reilly* cited *People* v. *Mijares* (1971) 6 Cal.3d 415,
422 [99 Cal.Rptr. 139, 491 P.2d 1115], in which the Supreme Court
held that handling a narcotic solely for disposal purposes does not con-
stitute possession, but observed "certain actions relating to abandon-
ment of narcotics may also fall within the proscription of section 135 of
the Penal Code, forbidding the destruction or concealment of evidence."
As a civilian witness watched, Mijares leaned inside a parked car, re-
moved an object therefrom, and threw it into a nearby field. In *Fields*,
this court questioned whether section 135 would apply to the *Mijares*
facts. "We question the applicability of Penal Code section 135 to the
*Mijares* fact situation since it would appear that the defendant's act of
disposing of the drugs occurred prior to the commencement of any po-
lice investigation. Nor can it be said the police investigation was 'about'
to commence when Mijares disposed of the drugs." (105 Cal.App.3d at
p. 346, fn. 4.)

*Fields* is, historically, the last word on point. The instant case pre-
sents a first impression point as to *when* evidence is about to be pro-
duced in a police or law enforcement department investigation. In other
words, should section 135 apply to the destruction of articles which the
defendant knows—or should know—would, if discovered in an investi-
gation which the defendant knows—or should know—is imminent, have
evidentiary value.

The Penal Code section 135 phrase "about to be produced in evidence
upon any trial, inquiry or investigation whatever" connotes an immedi-
acy or temporal closeness. In *Fields*, the authorities had already seized
the evidence. In *Reilly*, they had discovered it and seizure was immi-
nent. Presumably, the statute would apply where the defendant knows
that the officers are en route with a search warrant. (Cf. *People* v. *Ed-
gar* (1963) 60 Cal.2d 171, 173-174 [32 Cal.Rptr. 41, 383 P.2d 449]
[officers sought incriminating photos from defendant's mother, after de-
fendant overheard asking her to hide them. Though her initial refusal to
give them to officers did not violate § 135, the court implies that subse-

quent concealment would violate the section]; *People* v. *Santos* (1972) 26 Cal.App.3d 397, 402-403 [102 Cal.Rptr. 678] [defendant, charged with firearm murder, overheard telling wife to "Get rid of it." The confidential marital communications privilege (Evid. Code, § 980) "does not cover communications made to enable the other to commit a crime (Evid. Code, § 981), destruction or concealment of evidence being a crime. (Pen. Code, § 135.)"].)

The statute requires that the actor know that the object is *about to be* produced in evidence. We conclude that whatever the statute's exact meaning, the evidence herein falls short because the prosecution failed to show that any law enforcement investigation in fact had started and/or that law enforcement was or would be looking for the particular item. Unless this or a similar limiting interpretation is given, the statute would appear virtually open ended, at least in all but "victimless" crimes.

### ▮ *Admission of Evidence That Appellant Was With Danley When the Latter Was Arrested Was Proper*

Over timely objection on the ground of relevancy, the prosecution was permitted to cross-examine the appellant on the fact that the latter was (innocently) with Danley when Danley was arrested for car theft. It will be recalled that the victim's son had reported this theft to law enforcement. There was no evidence that the appellant knew this fact at the time of the arrest, but appellant admitted that he was present when Danley told a fellow juvenile hall resident that he was going to "take care of" Mrs. Erickson.

The question and answer tend to disprove those portions of appellant's testimony in which he alleged he did not know of any Brad Erickson or his family and tends to disprove his statement at trial that he did not know what Danley meant when he "overheard" Danley telling another juvenile hall resident that he was going to "take care of" Brad Erickson's mother.

A trial court is vested with wide discretion in deciding relevance of evidence. (*People* v. *Warner* (1969) 270 Cal.App.2d 900, 908 [76 Cal. Rptr. 160].) It was within the trial court's discretion to admit the testimony.

### ██ *The Flight Instruction Was Warranted by the Evidence*

Appellant contends the trial court prejudicially erred when it gave CALJIC No. 2.52, the standard flight instruction.[18] He implicitly concedes that evidence of flight existed but argues the instruction might have been used by the jury to find appellant's state of mind at the time the crime was committed, which it is claimed, is contrary to *People* v. *Anderson, supra*, 70 Cal.2d 15, 32-33.

Respondent asserts that Penal Code section 1127c mandated the instruction, that the instruction did not direct the jury to consider flight as bearing on appellant's mental state, and that other instructions informed the jury as to the intent required.

Penal Code section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows:

"The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine.

"No further instruction on the subject of flight need be given."

Appellant has cited no authority which suggests that the instruction was improper here. *Anderson* did not involve CALJIC No. 2.52 or flight evidence at all. Rather, it concerned other evidence of cognizance of guilt.

In essence, appellant's argument appears to be that the instruction should have been modified to limit the effect of flight to issues other than appellant's mental state.

---

[18]CALJIC No. 2.52 stated as follows at time of trial: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

The trial court has no *sua sponte* duty to modify the instruction.

*Appellant's Sentence on Count One Must Be Modified to Life Imprisonment; the Finding of Special Circumstances Should Be Stricken, and the Case Remanded for Disposition of the Weapon Use Enhancement.*

 Appellant, a juvenile at the time of the commission of the offense, cannot be sentenced to life imprisonment without possibility of parole. In *People* v. *Davis, supra,* 29 Cal.3d 814, 827-832, the Supreme Court examined the language and history of former Penal Code section 190 et seq. and concluded it could not be interpreted as authorizing life imprisonment without possibility of parole for persons under age 18. The court ordered that Davis' sentence be reduced to life imprisonment, the only alternative sentence authorized by the applicable statute.

Since *Davis* also holds former Penal Code section 190 et seq., read as a whole, offers no basis for even *charging* minors with special circumstances, we conclude the jury's determination of special circumstances in the present case was a nullity. (*People* v. *Davis, supra,* 29 Cal.3d at pp. 831-832.) Accordingly, we shall strike the special circumstance findings.

At sentencing, the trial court mentioned the jury finding of a weapon use enhancement and mentioned the fact appellant used a weapon as a factor in aggravation and as a potential reason to deny probation, in the context of discussing count one.

 When the life without possibility of parole sentence was imposed on count one, no mention was made of the Penal Code section 12022, subdivision (b) finding of the jury. The separate abstract of judgment for count one reflects the Penal Code section 12022, subdivision (b) finding but apparently appellant was neither sentenced pursuant to this enhancement finding nor does the record reflect the trial court ever exercised its discretion to strike the enhancement, as provided in Penal Code section 1170.1, subdivision (g). Therefore, the case must be remanded for the limited purpose of resentencing as to use of a deadly weapon in conjunction with count one. (*People* v. *Williams* (1980) 103 Cal.App.3d 507, 518-519 [163 Cal.Rptr. 169].) In the event the trial court does not exercise its discretion to strike the additional term of punishment for the deadly weapon use enhancement, the one-year term of punishment for use of a deadly weapon must be stayed, pursuant to the reasoning of *People* v. *Walker* (1976) 18 Cal.3d 232,

243-244 [133 Cal.Rptr. 520, 555 P.2d 306], pending finality of appellant's conviction and service of sentence on count one.

## Other Sentence Modifications

The trial court also imposed deadly weapon enhancements as to both counts two (robbery) and three (burglary). Appellant contends the use finding and enhancement must be stricken as to one of these counts. Appellant relies on In re Culbreth (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23].

Respondent asserts that both enhancements were proper because appellant acted with separate intents (to commit theft and later to rob). Alternatively, respondent argues that only the enhancement, not the finding should be stricken.

Respondent's premise appears to be mistaken. As to burglary, the intent was to commit theft, and robbery is simply an assaultive version of theft with the same underlying intent. Therefore only one deadly weapon use enhancement was proper. Even if technically different intents existed, respondent would be wrong. Culbreth holds that "if all the charged offenses are incident to one objective and effectively comprise an indivisible transaction, then section 12022.5 may be invoked only once and not in accordance with the number of the victims." (Id., at pp. 333-334.)

A fortiori, the same result should follow in a single-victim indivisible transaction, like the instant case.

The appropriate remedy is to modify the judgment to provide that appellant serve only one additional period of imprisonment pursuant to Penal Code section 12022, subdivision (b). (Id., at p. 335.) However, regardless of broad language in Culbreth, no striking of the underlying finding is required. This court need only insure that only one finding is effectuated. (People v. Walker, supra, 18 Cal.3d 232, 243-244.)

As a practical matter, this result was achieved when the trial court, pursuant to Penal Code section 654, properly stayed execution of sentence as to counts two and three, including of course, the additional enhancement terms for each. However, in the event that the Penal Code section 654 stay should be vacated, the additional term as to count

three must be stayed pending finality of conviction and service of sentence on count two, the stay then to become permanent. (*In re Culbreth, supra*, 17 Cal.3d at pp. 333-334.) We will modify the judgment to so provide.

The trial court purported to "merge" the sentences imposed as to counts two through six into the count one life term. As to counts two and three, this was inappropriate (*People* v. *Miller* (1977) 18 Cal.3d 873, 886-887 [135 Cal.Rptr. 654, 558 P.2d 552]). The stay of execution was proper. As to counts four and five, the merger was proper. As noted above, we have reversed the judgment as to count six.

The judgment is modified to provide that appellant is sentenced to state prison as follows: On count one (murder), to a term of life, the special circumstances findings are stricken; on count two (robbery), for the three-year middle base term plus an additional one-year term for use of a deadly weapon; execution of the sentence as to count two is stayed until finality of the conviction and sentence on count one, at which time the stay shall become permanent; on count three (burglary), for the two-year middle base term plus an additional one-year term for use of a deadly weapon; sentence on count three shall run concurrently with sentence as to count two; execution of the sentence as to count three is stayed until finality of the conviction and sentence on count one, at which time the stay shall become permanent; further, in the event that the stay of execution of sentence is vacated as to counts two and three, execution of the additional term for use of a deadly weapon as to count three is stayed until finality of the conviction and sentence as to count two, at which time the stay shall become permanent; on count four (vehicle theft), for the two-year middle base term; upon the finality of the conviction and sentence on count one, sentence as to count four is merged into the life term imposed on count one; on count five (escape), appellant is sentenced to county jail for six months; upon the finality of the conviction and sentence on count one, sentence as to count five is merged into the life term imposed on count one. Judgment as to count one is reversed and remanded for the limited purpose of re-sentencing as to the use of a deadly weapon. In the event the trial court does not exercise its discretion to strike the additional term of punishment for the deadly weapon enhancement, the one-year term for use of a deadly weapon is stayed pending finality of conviction and sentence on count one. As to count six, the judgment is reversed. The trial court is directed to prepare an amended abstract of judgment which reflects

such modification and to forward a certified copy of the amended abstract to the Department of Corrections, which shall file same.

Stone (C. V.), J.,* concurred.

**ANDREEN, J.**—I respectfully dissent.

I will attempt to demonstrate that even if a proper *Miranda*[1] warning was given, there was insufficient proof of a knowing and intelligent waiver of the right to the assistance of a court-appointed attorney prior to and during the questioning. Following that, I will discuss why I believe that the Supreme Court's opinion in *California v. Prysock* (1981) 453 U.S. 355 [69 L.Ed.2d 696, 101 S.Ct. 2806]) is an ill-considered disservice to the police, the courts and the public which is unsuitable for application to California's Constitution, "'a document of independent force.'"[2] Then I will discuss whether there was sufficient evidence to support a finding of premeditation and, finally, will question the majority's holding that Penal Code section 135 does not apply to the facts of this case.

### Knowing Waiver of Counsel

Sergeant Byrd did not advise defendant that he had a right to a free attorney in the interrogation room. Instead the officer advised the minor defendant of his right to have an attorney there, then diverted the discussion into an irrelevant dissertation of the right to have parents present, followed by the statement that he had a right to an appointed attorney. It is our duty to examine whether a trial court could make a finding, using the beyond-a-reasonable-doubt standard, that the defendant connected the two statements together and inferred therefrom that his rights included that of having an appointed attorney present prior to and during the questioning.

Circumspection must be exercised when making this determination because of the defendant's age. Thus, *In re Gault* (1967) 387 U.S. 1, 55

---

*Assigned by the Chairperson of the Judicial Council.

[1]*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[2]*People v. Disbrow* (1976) 16 Cal.3d 101, 115 [127 Cal.Rptr. 360, 545 P.2d 272], quoting *People v. Brisendine* (1975) 13 Cal.3d 528, 549-550 [119 Cal.Rptr. 315, 531 P.2d 1099].

[18 L.Ed.2d 527, 561, 87 S.Ct. 1428], when discussing the waiver of the constitutional privilege against self-incrimination by minors, stated: "If counsel was not present ... when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights...." As stated in *In re Anthony J.* (1980) 107 Cal.App.3d 962, 971 [166 Cal.Rptr. 238]: "The burden is upon the prosecution to establish that an accused's statements are voluntary; the burden is greater in the case of a juvenile than the case of an adult...."

The caution expressed in *Gault* has found verification in Grisso, *Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis* (1980) 68 Cal.L.Rev. 1134 (hereinafter cited as *Juveniles' Capacities to Waive Miranda*). The study's results, however, should be used with some caution, since in the statement of *Miranda* rights, the subjects were given an admonition which incorporated the word "interrogation," whereas Sergeant Byrd used the word "questioning," a more commonly used word. If the study had used "questioning" instead of "interrogation," one may expect that greater comprehension would have been obtained by the test subjects. (See the relatively low score of those who gave an adequate response to a vocabulary test of the word "interrogation" at p. 1153.)

Another factor which is impossible to weigh is the fact that the empirical research was conducted in a relatively unthreatening social situation and setting—one that differs markedly from that faced by the defendant here.

After making these allowances, however, one is struck with the fact that "The most frequently misunderstood *Miranda* warning ... was the statement that a suspect has the right to consult an attorney before interrogation and to have an attorney present during interrogation. Inadequate (zero-credit) descriptions of this warning were given by 44.8% of the juveniles and 14.6% of the adults." (*Juveniles' Capacities to Waive Miranda, supra*, at p. 1154.)[3]

---

[3]The majority's emphasis on that part of the study that concluded that most juvenile suspects understood the warning that the court would appoint an attorney if the suspect could not afford one is misplaced. The issue before us is whether the defendant knew that the appointment could *precede interrogation.* Likewise, the majority's reference to prior court experience as creating increased understanding must be read in the context of the entire report. The youths who had significantly higher scores in comprehension

We may disregard the effects lack of sleep and nutrition and any alcoholic ingestion as having been found against the defendant by the court below. However, even though the majority has found that the admonition meets constitutional muster, its opacity and ambiguity should be considered in determining whether the defendant knew that he had the right to a free lawyer prior to and during questioning.

It cannot be denied that the warnings given by Sergeant Byrd did not expressly advise defendant that, if he could not afford an attorney, he had a right to have one appointed at no cost prior to and during questioning. The defendant was told at one point that he had a right to have an attorney before and during questioning. At another point, he was informed: " . . . You all, uh—if—you have the right to have a lawyer appointed to represent you at no cost to yourself. . . . " Although the United States Supreme Court found this to be an adequate admonition, it nevertheless requires an inference that the discussion in reference to the appointment of a free attorney relates back to the right to have a lawyer prior to and during questioning. The two were not expressly connected together. In the face of the misunderstanding of the juveniles in *Juveniles' Capacities to Waive Miranda, supra,* as to this right and the caution expressed by the court in *Gault,* how can it be said that there is evidence from which the trial judge could have found *beyond a reasonable doubt* that the statement at issue was the product of a knowing and intelligent waiver of defendant's *Miranda* rights? (*People v. Braeseke* (1979) 25 Cal.3d 691, 701 [159 Cal.Rptr. 684, 602 P.2d 384], judgment vacated and cause remanded (1980) 446 U.S. 932 [64 L.Ed. 2d 784, 100 S.Ct. 2147], reiterated (1980) 28 Cal.3d 86 [168 Cal.Rptr. 603, 618 P.2d 149], cert. den. (1981) 451 U.S. 1021 [69 L.Ed.2d 395, 101 S.Ct. 3015].)

Although it is the defendant's understanding, not that of his parents, which we must examine, it is relevant to note Mrs. Prysock asked to go off the record with some questions about counsel almost immediately after Sergeant Byrd's admonition, and when they returned to the tape "their ensuing colloquy with the sergeant related to their option 'to *hire* a lawyer.'" (*California v. Prysock, supra,* 453 U.S. 355, 365 [69 L.Ed.2d 696, 704, 101 S.Ct. 2806, 2812] (dis. opn. of Stevens, J.).)

---

were those who had two or more prior felony referrals. The defendant was not in that category.

I can draw but one conclusion: The prosecutor failed to show beyond a reasonable doubt the necessary knowing and intelligent waiver of the right to a court-appointed attorney prior to and during the questioning.

CALIFORNIA'S PRIVILEGE AGAINST SELF-INCRIMINATION

Shortly after being taken to the police station, the defendant was given a statement of rights by a Sergeant Byrd. Defendant declined to talk. The record does not reveal the exact content of the advisement, the officer merely testified that he read a recitation of *Miranda* rights. (The majority does not suggest that there is a presumption that the statement was adequate. Proof of the contents of the statement should be a matter of the state's burden of proof.)

Defendant's parents were called, and they came to the station. About 20 minutes after defendant refused to talk, his mother entered the room where her son was located. She talked with him about 20 minutes. Defendant's mother exited and indicated defendant wished to discuss the events of earlier in the day. A few minutes after this Sergeant Byrd reentered the room where defendant was located; defendant's parents followed. Byrd took a taped statement from defendant which was admitted into evidence.

*A. The Advisement*

The issue can be presented by selecting portions of the statement and pertinent testimony given by Sergeant Byrd as to an off-tape discussion. The tape reflects the following:

"Sgt. Byrd: You have the right to talk to a lawyer before you are questioned, have him present with you while you are being questioned, and all during the questioning. Do you understand this?

"Randall P.: Yes.

"Sgt. Byrd: You also, being a juvenile, you have the right to have your parents present, which they are. Do you understand this?

"Randall P.: Yes.

"Sgt. Byrd: Even if they weren't here, you'd have this right. Do you understand this?

"Randall P.: Yes.

"Sgt. Byrd: You all, uh—if—you have the right to have a lawyer appointed to represent you at no cost to yourself. Do you understand this?

"Randall P.: Yes."

### B. Conversation Off the Record

Shortly thereafter, at the request of the defendant's mother, Mrs. Prysock, the conversation went off the record. The transcript then continues:

"Sgt. Byrd: Okay, Mrs. Prysock, you asked to get off the tape, we are going back on the tape and the time now is 22:55 hours, we, on 1/30/78, the time, uh, we were off the air, the record, record for approximately five minutes. During that time you asked, decided you wanted some time to think about getting, whether to *hire* a lawyer or not.

"Mrs. P.: 'Cause I didn't understand it.

"Sgt. Byrd: And you have decided now that you want to go ahead and you do not wish a lawyer present at this time?

"Mrs. P.: That's right.

"Sgt. Byrd: And I have not persuaded you in any way, is that correct?

"Mrs. P.: No, you have not.

"Sgt. Byrd: And, Mr. Prysock, is that correct that I have done nothing to persuade you not to, to *hire* a lawyer or to go on with this?

"Mr. P.: That's right." (Italics added.)

At trial, Sergeant Byrd was cross-examined in reference to a conversation after the statement was taken: "Q. [Defense counsel] Did you *ever mention to Mr. or Mrs. Prysock or Randy how much it would cost* them to *hire* an attorney?

"A. I think Mr. Prysock made some remarks to me that he didn't have money to hire an attorney. And I told him that the price of an attorney that Randy qualified for the Public Defender's office.

"And that the price of the attorney that this would be the proper people *to contact*, and that they had some excellent attorneys, I believe is the statement I made to him." (Italics added.)

*C. Discussion*

In *Miranda* v. *Arizona, supra*, 384 U.S. 436, the United States Supreme Court held: "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and *unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored*, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, *that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.* Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (*Id.*, at pp. 478-479 [16 L.Ed.2d at p. 726] fn. omitted, italics added.)

In our earlier opinion, we held that defendant's confession was procured in violation of his federal *Miranda* rights because "he was not given an adequate warning that he could have the services of a free attorney before and during the interrogation."

In so holding, we relied on two appellate court decisions, *People* v. *Bolinski* (1968) 260 Cal.App.2d 705 [67 Cal.Rptr. 347] and *People* v. *Stewart* (1968) 267 Cal.App.2d 366 [73 Cal.Rptr. 484].

In *People* v. *Bolinski, supra*, 260 Cal.App.2d 705, 718, 723, prior to giving a statement the defendant was told by one officer that if he was

charged he would be appointed counsel. Another officer told him that he had a right to a lawyer. The parties were then in Illinois and the second officer testified: "I advised him that the court would appoint one in Riverside County" and that "'a public defender would be furnished for him by the court.'" The court held these advisements were inadequate.

*People* v. *Stewart, supra,* 267 Cal.App.2d 366 held that a warning which told the defendant "'... that he had a right to an attorney, and he could have his attorney here; ... [¶] [that] he had a right to have the Public Defender appointed in case he couldn't afford an attorney; and that if he didn't want the Public Defender to be appointed, that he could pick an attorney and this attorney would be appointed by the Court for him,'" was not adequate. (*Id.*, at p. 378, fn. 16.) The court stated at page 378: "It is argued that the statement that defendant might have his attorney 'here' distinguishes *Bolinski* and satisfies *Miranda.* We do not agree. The burden is on the People to show that warnings of all the constitutional rights were given, that defendant understood them, and that he thereafter voluntarily and intelligently waived those rights. Ambiguities in the warnings must be resolved against the prosecution. As recounted in the case at bench, the warning could well have been interpreted to mean no more than that the court-appointed attorney would, at some future time, visit defendant in jail. This is not the equivalent of telling him that the interrogation would suspend until the attorney arrived."

We noted that the *Bolinski* warnings contained a stronger implication than the instant warnings that free counsel would be provided later. But the *Bolinski* warnings resembled the instant warnings in that there was no statement that free counsel would be provided prior to questioning if desired.

We also observed that the instant warnings closely paralleled the *Stewart* warnings. There the defendant was told that he could have his attorney "here," and that he had the right to have the public defender appointed. (*People* v. *Stewart, supra,* 267 Cal.App.2d at p. 378.) In the instant case defendant was told that he had a right to talk to a lawyer before and during questioning and that he had a right to have a lawyer appointed to represent him at no cost. In neither case was the defendant told that the free attorney could be present in the interrogation room.

In *California* v. *Prysock, supra,* 453 U.S. 355 [69 L.Ed.2d 696, 101 S.Ct. 2806], in a *per curiam* opinion to which three justices dissented,

the United States Supreme Court held that our original opinion was error as follows: "... the police in this case fully conveyed to [defendant] his rights as required by *Miranda.* He was told of his right to have a lawyer present prior to and during interrogation, and his right to have a lawyer appointed at no cost if he could not afford one. These warnings conveyed to [defendant] his right to have a lawyer appointed if he could not afford one prior to and during interrogation. The Court of Appeal erred in holding that the warnings were inadequate simply because of the order in which they were given." (453 U.S. at p. 361 [69 L.Ed.2d at p. 702, 101 S.Ct. at p. 2810], fn. omitted.)

At the outset, the Supreme Court remarked that our original opinion "essentially laid down a flat rule requiring that the content of *Miranda* warnings be a virtual incantation of the precise language contained in the *Miranda* opinion." (453 U.S. at p. 355 [69 L.Ed.2d at p. 699, 101 S.Ct. at p. 2807].)

After setting up this straw man, the Supreme Court knocked it down by observing that: "Quite the contrary, *Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures. The Court in that case stated that '[t]he warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent,* prerequisites to the admission of any statement made by a defendant.' 384 U.S. at 476 (emphasis supplied)." (453 U.S. at pp. 359-360 [69 L.Ed.2d at p. 701, 101 S.Ct. at p. 2809].)

The Supreme Court distinguishes *Bolinski* as follows: "In both instances [of warnings] the reference to appointed counsel was linked to a future point in time after police interrogation, and therefore did not fully advise the suspect of his right to appointed counsel before such interrogation.

"Here, in contrast, nothing in the warnings given respondent suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general, including the right 'to a lawyer before you are questioned, ... while you are being questioned, and all during the questioning.' [Citation.]" (453 U.S. at pp. 360-361 [69 L.Ed.2d at p. 702, 101 S.Ct. at p. 2810].)

The Supreme Court noted our reliance on *Stewart* but made no effort to distinguish it. (453 U.S. at p. 359 [69 L.Ed.2d at p. 701, 101 S.Ct. at p. 2809].)

The dissent criticized the majority for failing to come to terms with our finding that defendant was not given the information required by *Miranda*—the right to the presence of appointed counsel prior to and during questioning if desired. (453 U.S. at p. 362 [69 L.Ed.2d at p. 703, 101 S.Ct. at pp. 2811-2812].)

For the reasons stated below, I believe that defendant's confession was procured in violation of his privilege against self-incrimination contained in article I, section 15, of the California Constitution, which provides that "Persons may not ... be compelled in a criminal cause to be a witness against themselves,..."

In *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108], the California Supreme Court held that defendant's confession was inadmissible under the California Constitution because it was the product of a custodial interrogation renewed by the police after defendant had twice indicated to them that he wished to remain silent. *Pettingill* arose from *Miranda*'s rule that "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 473-474 [16 L.Ed.2d at p. 723], fn. omitted.) The court discussed a series of California holdings "which have applied that language and made it an intrinsic part of the law of this state." (*People* v. *Pettingill, supra,* 21 Cal.3d at p. 237.)

Earlier, in *People* v. *Disbrow, supra,* 16 Cal.3d 101, 113, our Supreme Court held: "... the privilege against self-incrimination of article I, section 15, of the California Constitution precludes use by the prosecution of any extrajudicial statement by the defendant, whether inculpatory or exculpatory, either as affirmative evidence or for purposes of impeachment, obtained during custodial interrogation in violation of the standards declared in *Miranda* and its California progeny...."

*Pettingill* and *Disbrow* establish that the basic standards declared in *Miranda* have become "an intrinsic part of the law of this state." Those standards include, of course, a warning to the effect that the interrogated defendant "has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 479 [16 L.Ed.2d at p. 726].) It remains for us to decide whether, under California law, defendant was adequately so warned.

He was not.

*Miranda* itself explained the importance of this particular requirement: "The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights. A mere warning given by the interrogators is not alone sufficient to accomplish that end. Prosecutors themselves claim that the admonishment of the right to remain silent without more 'will benefit only the recidivist and the professional.' Brief for the National District Attorneys Association as *amicus curiae*, p. 14. Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Cf. *Escobedo* v. *Illinois*, 378 U.S. 478, 485, n. 5. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning but also to have counsel present during any questioning, if the defendant so desires." (*Miranda* v. *Arizona, supra*, 384 U.S. at pp. 469-470 [16 L.Ed.2d at p. 721].)

The need for clear advisements in this particular area is underscored by the Grisso study which showed that 55.3 percent of juveniles and 23.1 percent of adults tested did not adequately understand at least one of the four *Miranda* warnings. *The most frequently misunderstood Miranda warning for both samples* was the statement that a suspect has the right to consult an attorney before interrogation and to have an attorney present during interrogation. (*Juveniles' Capacities to Waive Miranda, supra*, at pp. 1153-1154.)

*California* v. *Prysock* sets up a straw man, knocks him down, pays lip service to *Miranda*, and, in my view, proceeds to honor it in the breach. The *per curiam* opinion fails to explain how the instant advisements were a "fully effective equivalent" to the warning articulated in *Miranda*. The three dissenters were not persuaded. Neither am I.

The methodology selected by Sergeant Byrd here (first a statement of a right to have a lawyer before and during questioning, then the several

totally gratuitous comments relating to the right to have his parents present, followed by a general advisement of the availability of an appointed lawyer) is hardly a functional equivalent to a traditional *Miranda* warning.

As the dissent observed in *California* v. *Prysock*: "The ambiguity in the warning given respondent is further demonstrated by the colloquy between the police sergeant and respondent's parents that occurred *after* respondent was told that he had the 'right to have a lawyer appointed to represent you at no cost to yourself.' Because lawyers are normally 'appointed' by judges, and not by law enforcement officers, the reference to appointed counsel could reasonably have been understood to refer to trial counsel. That is what respondent's parents must have assumed, because their ensuing colloquy with the sergeant related to their option 'to hire a lawyer.'" (*California* v. *Prysock, supra*, 453 U.S. 355, 364 [69 L.Ed.2d 696, 704, 101 S.Ct. 2806, 2812], fn. omitted, italics original (dis. opn. of Stevens, J.).)

The *per curiam* opinion responds that "the reference to 'appointed' counsel has never been considered as suggesting that the availability of counsel was postponed...." (453 U.S. at p. 361, fn. 3 [69 L.Ed.2d at p. 702, 101 S.Ct. at p. 2810].) Perhaps not, because under the traditional *Miranda* warnings as memorialized in thousands of department-issued *Miranda* cards the defendant has been told that the appointment would occur "prior to any questioning if he so desires." When the term "appointment" is used without such equivalently clear indication as to timing, it lends itself to the very ambiguity found herein.

To reiterate, the defendant was told that he had a right to talk to a lawyer before he was questioned and to have him present during the questioning. The officer then could and should have advised the defendant that if he could not afford an attorney one would be appointed for him prior to any questioning if he desired. Instead, the officer diverted the conversation to a discussion of the minor's right to have his parents present. This was a needless excursion, since both parents were seated in the room with their son. Then, instead of advising the minor that a free attorney would be provided prior to questioning if desired, the officer said, "You all, ... you have the right to have a lawyer appointed to represent you at no cost to yourself."

I repeat what we said in our earlier opinion: "Unfortunately, the minor was not given the crucial information that the services of the free attorney were available *prior to the impending questioning.*

"The matter was obfuscated, rather than clarified, by the off-the-record discussion...."

The question before us is not, as the United States Supreme Court *per curiam* opinion would have it framed, whether there must be a "talismanic incantation" of the *Miranda* language. (*California* v. *Prysock, supra,* 453 U.S. at p. 359 [69 L.Ed.2d at p. 701, 101 S.Ct. at p. 2809].) Rather, the question is whether appellant was "adequately and effectively apprised of his rights," "in clear and unequivocal terms." (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 467-468 [16 L.Ed.2d at p. 720].) I believe that as a matter of California law, the advisement in the instant case did not adequately inform the defendant of his key right to have a free lawyer before and during the police interrogation. The basis of this is not a requirement of an exact recitation of the traditional *Miranda* warning,[4] nor a requirement of any particular sequencing, but simply the reality that the words chosen by the sergeant did not communicate the necessary information.

The majority herein cites the subsequent history of *In re Michael C.* (1978) 21 Cal.3d 471 [146 Cal.Rptr. 358, 579 P.2d 7] as authority as to how we should handle the remand. In that case, the California Supreme Court had held that when a juvenile asked to see his probation officer this was an invocation of Fifth Amendment rights. The United States Supreme Court disagreed. (*Fare* v. *Michael C.* (1979) 442 U.S. 707 [61 L.Ed.2d 197, 99 S.Ct. 2560].) It distinguished the role of a probation officer from that of an attorney, and reversed and remanded. Our Supreme Court acceded to that view.

---

[4]Although the precise words normally recited in a *Miranda* wording are not the exclusive way of adequately imparting rights to a suspect, I would hope that, since the *Miranda* requirements can be met so easily by reading from a card, that the traditional liturgy will continue to be used. Otherwise, courts will be forced back to the pre-*Miranda* task of individually examining the nuances of the advisement in order to determine on a case-by-case basis whether a suspect understood his rights.

In its decisions incorporating *Miranda* into state law, the California Supreme Court has repeatedly recognized that the cardinal virtue of *Miranda* is that it creates "a single, uncomplicated, universally applicable test" (*People* v. *Disbrow, supra,* 16 Cal.3d at p. 111) and that this promoted "stability and predictability of the law on this important topic." (*People* v. *Pettingill, supra,* 21 Cal.3d at p. 250.)

Many areas of the law do not lend themselves to clear-cut, workable rules. The content of *Miranda* warnings, however, does, and it is a disservice to the police and to the courts, as well as suspects, not to provide them "bright-line" rules in this regard.

The case at bench is quite different. Whatever may be said of *California* v. *Prysock, supra,* 453 U.S. 355 [69 L.Ed.2d 696, 101 S.Ct. 2806], it cannot be gainsaid that it is a retrenchment from the requirement of a clear and unequivocal statement of *Miranda* rights. As such, it is a departure from California law which requires an explicit statement that a defendant may have a free lawyer before and during his interrogation. *Miranda* warnings are an intrinsic part of the law of this state. It is not an expansion of that law to hold that the admonition given here was insufficient. Rather, such a holding is necessary to preserve a well-established body of our jurisprudence.

*Miranda,* as applied in California, has stood the test of time. With this case as an exception, law enforcement practices have adjusted to its strictures. Two of its virtues are that its meaning is clear and its requirements easily met.

When interpreting the self-incrimination clause of the California Constitution (art. I, § 15), California courts treat it as "'a document of independent force' (*People* v. *Disbrow* (1976) 16 Cal.3d 101, 115...; *People* v. *Brisendine* (1975) 13 Cal.3d 528, 549-550...), 'whose construction is left to this court, informed but untrammeled by the United States Supreme Court's reading of parallel federal provisions. [Citations.]' (*Reynolds* v. *Superior Court, supra,* 12 Cal.3d 834, 842.)" (*Allen* v. *Superior Court* (1976) 18 Cal.3d 520, 525 [134 Cal.Rptr. 774, 557 P.2d 65].)

There is little to be gained and much to be lost by creating ambiguity where certitude existed before. The rule in *California* v. *Prysock, supra,* 453 U.S. 355 [69 L.Ed.2d 696, 101 S.Ct. 2806] serves neither the public nor private interest.[5] Engrafting it onto California constitutional law would be ill advised. This court should not do so.

### SUFFICIENCY OF EVIDENCE TO SUPPORT PREMEDITATION

I concede that if the defendant's statement to Sergeant Byrd is admissible, there is sufficient evidence to show premeditation. I write this to demonstrate, however, that absent such admissibility, there is insuffi-

---

[5]See footnote 4, *ante,* and the discussion in *Fare* v. *Michael C., supra,* 442 U.S. 707, 718 [61 L.Ed.2d 197, 208, 99 S.Ct. 2560, 2568] which discusses the specific nature of the *Miranda* rules benefiting the accused and the state alike.

cient evidence.[6] In this discussion, I will disregard the statements of Prysock to Sergeant Byrd and the fruit of those statements in form of his trial testimony.

When considering defendant's contention that substantial evidence does not support his conviction of first degree murder, the standard enunciated in *People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738], is applicable. We must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. In performing this task, we do not limit our review to that evidence which is favorable to respondent. The issue is resolved in the light of the whole record—the entire story put before the jury—rather than a review of isolated bits of evidence selected by the respondent. From that review, we judge whether the evidence of the commission of each of the essential elements of the crime is substantial enough to support the conclusion of a reasonable trier of fact under the beyond-a-reasonable-doubt standard. It is not enough for the respondent simply to point to "some" evidence supporting the finding. The evidence, together with those inferences which can be reasonably deduced therefrom, must be substantial in light of the other facts.

The finding of deliberation and premeditation may have been the basis of the verdict of murder of the first degree. (Pen. Code, § 189.)

The California Supreme Court has made clear that when circumstantial evidence arguably forms the basis for proving premeditation and deliberation, special caution must occur. "[W]e must determine in any

---

[6]If there were to be a retrial, it would be necessary to discuss the issue of sufficiency of evidence to support the finding that defendant killed his victim with deliberation and premeditation because of the holding in *People* v. *Bonner* (1979) 97 Cal.App.3d 573 [158 Cal.Rptr. 821]. In *Bonner*, the trial court found the defendant guilty of possessing for sale one-half ounce or more of heroin. The appellate court affirmed the conviction of guilt but found that the record did not contain substantial evidence that the substance in question weighed one-half ounce or more, and remanded for trial on the sole issue of weight. On a petition for rehearing, the appellate court, relying on *Burks* v. *United States* (1978) 437 U.S. 1 [57 L.Ed.2d 1, 98 S.Ct. 2141], ruled that the double jeopardy clause forbade a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. The matter was thus remanded for the purpose of sentencing defendant as a person convicted of possessing for sale less than one-half ounce of a substance containing heroin.

case of circumstantial evidence whether the proof is such as will furnish a *reasonable foundation* for an inference of premeditation and deliberation [citations], or whether it 'leaves only to *conjecture and surmise* the conclusion that defendant either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation.'...." (*People* v. *Anderson* (1968) 70 Cal.2d 15, 25 [73 Cal.Rptr. 550, 447 P.2d 942], italics original.) The high court then went on to describe how the sufficiency of the evidence for premeditation and deliberation should be assessed: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)...." (*Id.*, at pp. 26-27, italics original.)

As to *Anderson*'s first category (planning), the two boys, defendant and Danley, drove aimlessly around the Tulare County countryside from the time of the escape from the Robert K. Meyers Youth Center, sometime before 8 p.m. January 28, 1978, until the midmorning of January 30. They needed food and clothes and went to Danley's house to obtain the same on January 30, but were frustrated by his mother's presence at the house. Danley then drove to the Erickson house, remarking that he knew a house where they could get some food and clothes. The evidence of what they did at that house is indicative of

planning a burglary of an empty house, not a homicide. They drove by several times; Danley checked the garage, presumably looking for the victim's car which was not there because it was being repaired. Danley made several calls from a local convenience store, probably to see if anyone was home. He did not converse with anybody, presumably because the calls went unanswered. They did not arm themselves; they attempted entry by breaking out a rear window.

On the other hand, the boys did not flee when confronted by the victim, but instead entered the house. Defendant may have known the identity of the victim, and was present when, a few weeks before, Danley told another juvenile that he was going to "take care of" Brad Erickson's mother.

On balance, it is apparent that a reasonable trier of fact would find that the boys had attempted to avoid Mrs. Erickson up to the time that she discovered Danley breaking the glass, and that the death was not the result of premeditation and deliberation but rather was the result of Danley's explosion of violence after they had entered the residence and after defendant struck the first two (or three) blows with a wooden dowel. As stated in *People* v. *Anderson, supra*, 70 Cal.2d at page 26: "... we find no indication that the Legislature intended to give the words 'deliberate' and 'premeditated' other than their ordinary dictionary meanings. Moreover, we have repeatedly pointed out that the legislative classification of murder into two degrees would be meaningless if 'deliberation' and 'premeditation' were construed as requiring no more reflection than may be involved in the mere formation of a specific intent to kill. [Citations.]"

With regard to the second category (motive), defendant, as previously stated, was with Danley when Danley was arrested for auto theft as a result of a report made by the victim's son, Brad Erickson. On the other hand, defendant knew neither Mrs. Erickson nor her son Brad; had never been slighted by the Erickson family; was not arrested in connection with the auto theft reported by Brad Erickson; and as a casual friend of Danley for two years, was never shown to have known or shared Danley's desire for revenge as a result of the arrest discussed above. Defendant repeatedly testified that he never desired or intended to have Mrs. Erickson die.

In reference to the third category (manner), the evidence fails entirely. Respondent points to the fact that Danley stabbed the victim eight

times with an ice pick in the back. The wounds were shallow, approximately one inch to one and one-quarter inch in depth. Respondent argues that this denotes "careful, calculated stabbing." The pathologist testified that the wounds "did not penetrate the body cavity. They stopped at the bony structures, ..." Rather than showing the precision of a surgeon with his scalpel, the shallow wounds demonstrate only that the blows were strong enough to go through subcutaneous fat and muscle but not strong enough to penetrate the rib cage. Nor does the fact that death was caused by strangulation by a telephone cord demonstrate deliberation and premeditation. The cord was not carried to the premises by Danley—he cut it from the telephone receiver during the attack. In short, the record is devoid of any evidence tending to prove that the killing was done in such a particular and exacting fashion that premeditation and deliberation could be inferred.

The evidence adduced at trial showed no strong evidence of planning. It also demonstrated that any knowledge of or prior relationship with the victim on defendant's part is pure speculation in light of the fact none of the Ericksons who testified knew him. Finally, the manner of execution of the crime showed lack of sophistication and any demonstrated forethought.

I would conclude that there is no substantial evidence by which a reasonable trier of fact could find deliberation and premeditation beyond a reasonable doubt. This conclusion does not mean that upon a retrial the defendant could not be found guilty of first degree murder on grounds other than on a finding of deliberation and premeditation.

## PENAL CODE SECTION 135

Defendant levels a three-part attack on his conviction of violating Penal Code section 135, which provides: "Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is about to be produced in evidence upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor."

Defendant argues that the evidence of his guilt is insufficient, that the trial court erred in failing to instruct *sua sponte*, on the meaning of the phrase "about to be produced in evidence," and that the statute is unconstitutionally vague.

A. *Evidentiary Sufficiency*

Defendant contends that the evidence is insufficient to establish that the clothing and shoes burned by himself and Danley after the crime were about to be produced in evidence and/or that he so knew.

Respondent asserts that the evidence sufficed because the clothing was burned after crimes as to which the clothing would be evidence and because appellant knew that an investigation was imminent or in progress.

Although the point appears to be one of first impression, other statutes dealing with the same general topic as Penal Code section 135 are instructive.

In *People* v. *McAllister* (1929) 99 Cal.App. 37 [277 P. 1082] the trial court entered a dismissal following the sustaining of a demurrer in an action which charged defendant with offenses of offering and giving bribes to persons about to be called as witnesses in a civil case not yet filed. Penal Code section 137 proscribed bribing a person "about to be called as a witness." The defendant in that case, as the one here, contended that the section had no application where it does not appear that there was any action or proceeding pending which might be affected by any misconduct of the defendant.

The appellate court reversed and ordered the trial court to overrule the demurrer. The court stated at pages 40-41: "At the outset it must be remembered that this is a law primarily to prevent the corrupt interference with the administration of justice. Its purpose is to go back as far as necessary and say in effect that any attempt to so influence prospective witnesses that the truth will not be presented in anticipated litigation is felonious. In *State* v. *Holt*, 84 Me. 509 [24 Atl. 951], it was said in effect, although perhaps the statement is *obiter dictum*, that in a prosecution similar to the one before us the indictment need not aver that the witness had been summoned, or even that a cause was pending requiring the attendance of witnesses. Surely, it is not the imminence of the person being called as a witness nor the fact that his being called may be postponed for a time that is determinative of the act coming within the purview of this section. It is the intent of the person interested and his purpose and design that is decisive of that question. True, a person cannot be a witness unless there is an action pending, but a per-

son may be about to be called as a witness even though no action is pending...."

To the same effect, see *People* v. *Martin* (1931) 114 Cal.App. 392, 394-395 [300 P. 130], where an offer of a bribe shortly after an automobile accident and before any suit had been filed was a bribery of a person "about to be called as a witness."

*People* v. *Broce* (1977) 76 Cal.App.3d 71 [142 Cal.Rptr. 628] involved an attempt to induce a witness to give false testimony by threats of force regarding facts establishing probable cause to arrest. The attempt to influence testimony occurred two days after an arrest and before any action was filed. This was sufficient to sustain a conviction of violation of section 137 of the Penal Code of attempting to induce a person "about to be called as a witness" to give false testimony. The court stated at page 75: "Defendant contends that he did not violate Penal Code section 137. He points out that Weinald was neither a witness nor a possible witness with respect to the weapons possession charge pending against defendant. This is true, but irrelevant. Weinald's observations were material to the legality of defendant's arrest—whether he planned to raise its illegality as a defense to the criminal charges or, affirmatively, in an action for false arrest. Nor does it matter that no such action was pending at the time of the threat. Section 137 contains no such requirement."

I acknowledge that this court has opined in dicta in *People* v. *Fields* (1980) 105 Cal.App.3d 341 [164 Cal.Rptr. 336] that a fact situation as it existed in *People* v. *Mijares* (1971) 6 Cal.3d 415 [99 Cal.Rptr. 139, 491 P.2d 1115] would not sustain a conviction for violation of Penal Code section 135. In *Mijares* it was the defense contention that the defendant picked up a friend at a street corner in a drowsy condition which progressed into unconsciousness. Unable to revive him, the defendant decided to secure medical help at a fire station. He looked inside his friend's pockets and found some heroin which he threw into a field before he sought assistance. The Supreme Court reversed a conviction for possession of narcotics holding that the jury should have been instructed that if it believed the defendant had no contact with the heroin other than to remove it from his friend's pocket for disposal, such handling is insufficient for conviction of the crime of possession as defined by former section 11500 of the Health and Safety Code.

Nine years after *Mijares*, this court, in a footnote to *People* v. *Fields, supra*, 105 Cal.App.3d at page 346, footnote 4, said: "We question the applicability of Penal Code section 135 to the *Mijares* fact situation since it would appear that the defendant's act of disposing of the drugs occurred prior to the commencement of any police investigation. . . ." The statement was not necessary to the opinion and there was no recognition of *McAllister, supra*, 99 Cal.App. 37, or its progeny. The goal of preventing interference with the administration of justice will not be met if evidence may be destroyed with impunity merely because the police have not commenced their investigation.

Although the matter is not clear, I would hold that the evidence was sufficient to sustain a conviction of section 135.

## B. *Instructional Error*

Appellant argues that ambiguity of the phrase "about to be produced in evidence" necessitated a *sua sponte* instruction.

The jury was instructed regarding the violation of Penal Code section 135 in the language of the statute. Appellant did not request a cautionary instruction as to the meaning of "about to be produced in evidence." Absent a specific request, the court need only instruct on general principles of law and need not give a cautionary instruction. (*People* v. *Baker* (1974) 39 Cal.App.3d 550, 557 [113 Cal.Rptr. 248].)

## C. *Vagueness*

Defendant contends that section 135 is void for vagueness under state and federal guaranties of due process.

"'[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning . . . violates the first essential of due process of law.'" (*People* v. *McCaughan* (1957) 49 Cal.2d 409, 414 [317 P.2d 974], quoting *Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) "A statute must be definite enough to provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it." (*People* v. *McCaughan, supra*, 49 Cal.2d at p. 414.)

Section 135 comports with all requirements of due process. It adequately notifies those potential violators that evidence which is or will imminently be sought for trial, inquiry or investigation shall not be destroyed. It gives ample guidance to the courts in enforcing the law. The contention that the statute is void for vagueness is meritless.

### CONCLUSION

I would reverse because of the *Miranda* error and because there was not an adequate showing of an intelligent waiver of the presence of a court-appointed attorney during the interrogation.

A petition for a rehearing was denied February 17, 1982. Andreen, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied April 15, 1982. Bird, C. J., Mosk, J., and Reynoso, J., was of the opinion that the petition should be granted.